## Kaufmann v. Kaufmann.

*Partnership—Good will—Leasehold.*

1. Good will as an element of value or an asset of a partnership business has no meaning, except in connection with a continuing business.

2. Where partnership articles provide that upon the death of one of the partners, the surviving partners shall purchase the interest of the deceased partner for a sum equal to the deceased's share "of the net assets of the firm at the inventory last preceding" the death of the deceased, "and further plus an amount equal to ten per cent. of the aforesaid decedent's partnership interest in consideration of the decedent's part of the good will of this firm," and it appears that certain valuable leaseholds on the property where the business was conducted were not included in the inventory, such leaseholds will be considered as included in the good will, and cannot be made an item of separate charge.

3. In such a case the fact that the partnership had a contract with its employees from which it appeared that the partners as between themselves treated the increment on the leaseholds as profits has no bearing on the construction of the partnership articles, since the latter indicate without any ambiguity that the leaseholds were included in the good will.

*Partnership—Dissolution by death—Purchase by survivors of deceased partner's interest—Construction of partnership articles —Contracts.*

4. Partnership articles provided that upon the death of a partner, the surviving partners "shall purchase all the right, title and

interest therein of the decedent for a sum equal to his share of the net assets of the firm at the inventory last preceding the said death, minus such amount as he may have drawn in cash or merchandise and plus such amounts as he may have contributed over and above his share from the time of his death back to the last preceding inventory, and further plus an amount equal to ten per cent. of the aforesaid decedent's partnership interest, in consideration of the decedent's part of the good will of this firm." The articles further provided that notes might be given in payment for the deceased partner's share, with rights to certain renewals, and with interest on all rights and renewals at four per cent. *Held,* (1) that the word "aforesaid" did not refer to the person of the partner dying, but to his interest in the net assets of the firm at the inventory last preceding his death; (2) that the ten per cent. was to be calculated on the deceased partner's share as shown by the inventory last preceding his death without any diminution on account of profits distributed to him between the date of such inventory and his death; (3) that the deceased partner's estate was not entitled to have included in the amount on which the ten per cent. was to be calculated, certain discounts on the inventory value of the assets which were carried from year to year in a private ledger without ever having been entered in any inventory as an asset; (4) that the estate of the deceased partner was not entitled to participate in any earnings between the date of the last preceding inventory and the date of the deceased partner's death; (5) that for the delay resulting from the litigation caused by an insufficient tender on the part of the surviving partners, the latter should be charged interest at the rate of four per cent. fixed by the articles.

Argued November 4, 1912.  Appeals, Nos. 201 and 218, Oct. T., 1912, by plaintiffs and defendants, from decree of C. P., No. 1, Allegheny Co., Sept. T., 1909, No. 615, on bill in equity in case of Augusta Kaufmann, Executrix, Alfred D. Kaufmann and Raymond M. Kaufmann, Executors of the last will and testament of Jacob Kaufmann, deceased, v. Isaac Kaufmann, Morris Kaufmann and Henry Kaufmann, individually and as partners who survive Jacob Kaufmann, deceased, late partners as Kaufmann Brothers.  Before FELL, C. J., BROWN, MESTREZAT, ELKIN and STEWART, JJ.  Reversed.

Bill in equity for an accounting.

At the trial it appeared that:

Jacob Kaufmann died November 1, 1905. He was one of the four members of the firm of Kaufmann Brothers, which owned and operated a very large department store in the City of Pittsburgh and held one-fourth undivided interest therein.

In 1897 Jacob Kaufmann entered into an agreement of partnership with his three brothers, Isaac, Morris and Henry, the thirteenth and fourteenth paragraphs of which agreement gave to the surviving partners the right to purchase the interest of a deceased partner on certain terms set out in those paragraphs. After Jacob Kaufmann's death in 1905, his representative filed a bill in equity against the survivors to compel an accounting for the decedent's one-fourth interest, on the theory that a subsequent change in circumstances and a series of agreements entered into between the four partners and certain of their employees had superseded the original agreement and rendered the provisions of the thirteenth and fourteenth paragraphs no longer equitable or binding. This suit in due course came into this court, and it was decided in Kaufmann v. Kaufmann, 222 Pa. 58, that the original agreement was still in force, and the estate of Jacob Kaufmann was bound by its provisions. The bill was thereupon dismissed on June 23, 1908, "without prejudice to the rights of the plaintiffs to proceed to the collection of such sum as may be due them under the contracts existing between the parties."

The present action was begun by filing a bill of complaint July 28, 1909, for discovery and accounting, to compel the survivors to pay to the plaintiffs, executors of the estate of Jacob Kaufmann, the value of his one-fourth interest in the firm as determined by the partnership agreement of 1897. The plaintiffs claimed that the defendants were offering to pay them a sum much less than they were entitled to receive for the interest of the deceased in the partnership; and that defendants

refused to allow plaintiffs to examine the books and papers of the firm in order to inform themselves as to what sum was rightfully due. Defendants admitted in their answer that the sum of $269,263.70 was due to plaintiffs under the contract, and on June 22, 1911, that sum was paid to plaintiffs with interest from December 1, 1905, to January 1, 1907.

Plaintiffs claimed specifically that defendants' offer of payment for Jacob Kaufmann's interest was insufficient, in the following:

1. That on January 1, 1905 (the date at which Jacob Kaufmann's interest was to be determined under the contract), the firm of Kaufmann Brothers owned a number of valuable leaseholds; the plaintiffs were entitled to share in those leaseholds, and that defendants were refusing to pay them any part of their value.

2. While the defendants admitted a certain amount to be due to the plaintiffs, i. e., $269,263.70, with 4 per cent. interest thereon for thirteen months, they refused by reason of a tender of payment of the same on December 27, 1906, to pay any interest on that sum to the plaintiffs. Plaintiffs claimed that the tender was worthless and that interest was due at 6 per cent. on the said sum from January 1, 1905, to June 22, 1911.

3. That under the terms of the partnership agreement 10 per cent. of the decedent's partnership interest was to be allowed in consideration of his share of the good will; that defendants had improperly calculated that 10 per cent. by taking it only on the capital of Jacob Kaufmann on January 1, 1905, and not on the total amount of his partnership interest on that date.

4. That on January 1, 1905, at the time of taking the inventory the partners did not divide all the profits but set apart $169,000 as a reserve, which sum was carried as an asset through the year 1905, and was all divided up among the survivors on January 1, 1906, as a part of the profits. Plaintiffs claimed that they were entitled to a one-fourth part of that sum.

5. That defendants were refusing to pay the plaintiffs any part of the earnings of the year 1905, although Jacob Kaufmann had lived until November 1, 1905, and all his capital was invested in the business and his services rendered thereto for ten months of the year.

The answer was filed and the matter came on for hearing on December 21, 1910, on the preliminary question of plaintiffs' right to share in the leaseholds. On May 15, 1911, the learned trial judge decided that the plaintiffs were so entitled and directed that testimony be taken as to the value of the leaseholds and on the other questions in the case. The final hearing was had, and on May 15, 1912, the learned trial judge handed down his decision on the whole case and decided:

(1) That the leaseholds on January 1, 1905, were worth $235,525.92, and that defendants were to pay the plaintiffs the one-fourth part of that sum, or $58,881.48. But that they need not pay any interest on that sum from January 1, 1905, to the present time.

(2) That the defendants' alleged tender on December 27, 1906, did not bar the running of interest on the admitted sum due and that defendants should pay to the plaintiffs interest on the said sum at the rate of 4 per cent.

(3) That the item of 10 per cent. for good will was properly calculated on the amount of the deceased partner's capital only.

(4) That the reserve of $169,000 was an asset on January 1, 1905, but the plaintiffs had no right to share therein.

(5) That the plaintiffs had no right to a share of the profits of the year 1905.

Exceptions were filed by both parties to this decision and on July 5, 1912, the court in banc filed an opinion, leaving the former decision unchanged except that it decided that the sum of $169,000 was not an asset on January 1, 1905. Final decree was entered in the following form: And now, to wit, September 9, 1912, this

matter came on for hearing upon bill, answer and testimony taken, exceptions filed and argument thereon, and after due and careful consideration thereof, it is ordered and decreed:

First. That the defendants pay to the plaintiffs the sum of $58,881.48, being the value, on January 1, 1905, of plaintiffs' one-fourth share of the asset value of the leaseholds held by the firm of Kaufmann Brothers on that date.

Second. That the defendants also pay to the plaintiffs the sum of $48,198.21 as interest at the rate of 4 per cent. from January 1, 1907, to June 22, 1911, on the sum of $269,263.70.

Third. That plaintiffs and defendants each pay their own costs and each pay one-half of the record costs.

*Error assigned,* among others, by both parties, was the final decree of the court.

*Ernest C. Irwin* and *D. T. Watson,* with them *John G. Johnson, C. Chester Kaufmann* and *John M. Freeman,* for Augusta Kaufmann, Executrix, et al.—The court below erred in calculating 10 per cent. for good will only on the decedent's capital on January 1, 1905, and not on the whole amount of his partnership interest at that time: Fitch v. Bates, 11 Barb. 471; Dean v. Dean, 54 Wis. 23 (11 N. W. Repr. 239).

The court below erred in allowing only 4 per cent. interest from January 1, 1907, on the amount admitted to be due to the estate of Jacob Kaufmann, deceased. Six per cent. interest should have been allowed, and from December 1, 1905: Wright v. Hanna, 210 Pa. 349; Biabloca's Petition, 50 Pa. Superior Ct. 181.

The court below erred in refusing plaintiffs any interest on the sum of $58,881.48 allowed for decedent's share of the leaseholds: Plumly's App., 24 W. N. C. 281; Gyger's App., 62 Pa. 73; Brenner v. Carter, 203 Pa 75;

Rea v. R. R., 229 Pa. 106; James v. West Chester Borough, 220 Pa. 490.

The court below erred in not awarding to plaintiffs the one-fourth of the reserve sum of $169,000 set aside at the time of the inventory of January 1, 1905.

The decisions have uniformly held to the same proposition that an inventory is a detailed list of articles with the separate value of each: Roberts, Willis & Taylor Company v. Insurance Co., 48 S. W. Repr. 559.

Jacob Kaufmann's estate is entitled to the one-fourth of the earnings of the firm from January 1, 1905, up to his death, November 1, 1905: Browning v. Browning, 31 Beav. 316; Page v. Ratliffe, 76 L. T. (N. S.) 63; Case v. Cushman, 3 W. & S. 544; Blisset v. Daniel, 10 Hare 493.

The court erred in saying that the partnership agreement of 1897, and especially the thirteenth (13th) paragraph thereof, excluded and barred from consideration in fixing the purchase money for the selling partner's interest any firm asset not bodily and specifically in the balance account.

The appellants are clearly entitled to share in the leaseholds owned by the firm on January 1, 1905: McCutcheon v. Smith, 173 Pa. 101; Blisset v. Daniel, 10 Hare 493; Coventry v. Barclay, 3 De Gex J. & S. 320; Eaton's App., 66 Pa. 483; Sheldon v. Houghton, 21 Fed. Cases 1239, Case No. 12,748.

*Wm. B. Rodgers,* with him *Samuel Dickson, J. Rodgers McCreery* and *Joseph Stadtfeld,* for Isaac Kaufmann, et al.—The purpose of paragraph thirteenth was to make certain the passing of a deceased partner's interest and fix absolutely the price thereof, so as to avoid accounting after death.

The leaseholds were intended to pass with the other assets: Rohrbacher's Est., 168 Pa. 158.

Plaintiffs are not entitled to interest because they denied our right to purchase and refused our tenders of

payment: Kaufmann v. Kaufmann, 222 Pa. 58; Mathis
v. Thomas, 101 Ind. 119; Hills v. Bank, 105 U. S. 319;
Thorndike v. Wells Mem. Assn., 146 Mass. 619 (16 N.
E. Repr. 747); Gyger's App., 62 Pa. 73; Hagan v. Cont.
National Bank, 182 Mo. 319 (81 S. W. Repr. 171);
Grand Lodge A. O. U. W. v. Scott, 97 N. W. Repr. 637;
Memphis City Bank v. Smith, 110 Tenn. 337 (75 S. W.
Repr. 1065).

The "balance account" of January 1, 1905, was an ac-
count stated and settlement among the partners: Rehill
v. McTague, 114 Pa. 82; Clark v. Fowler, 57 Cal. 142;
Edens v. Williams, 36 Ill. 252; Reynolds v. Patrick, 52
Mich. 590 (18 N. W. Repr. 372); Groenendyke v. Cof-
feen, 109 Ill. 325; Dial v. Rodgers, 4 Desaus (S. C.) 175.

OPINION BY MR. JUSTICE STEWART, January 6, 1913:

The contending parties to this proceeding being alike
dissatisfied with the result reached in the court below,
we have here two appeals from the same decree. We
shall endeavor to dispose of all the matters in issue in
a single opinion. The facts as stated by the reporter
are quite sufficient to acquaint with a history of the
case, and these need not be repeated here. That the
partnership agreement of 24th November, 1897, ex-
presses the terms upon which, in the event of the death
of any one of the partners, the survivors were to ac-
quire the interest of the deceased partner is admitted;
disagreement arises only as the value of the deceased
partner's interest becomes a question for determination.
The several sections of the agreement which are involved
are thirteenth and fourteenth. These we here recite:

"13th. In the event of the death of any one or more
of said copartners, the deceased party's estate shall not
continue to retain the decedent's partnership interest,
but the said interest shall, within thirty days after such
death, be considered as absolutely withdrawn and sev-
ered from the business of said firm, and the surviving
partners shall purchase all the right, title and interest

therein of the decedent for a sum equal to his share of
the net assets of the firm at the inventory last preced-
ing the said death, minus such amounts as he may
have drawn in cash or merchandise and plus such
amounts as he may have contributed over and above his
share, as set forth in Article II of this agreement, from
the time of his death back to the last preceding in-
ventory, and further plus an amount equal to ten (10)
per cent. of the aforesaid decedent's partnership inter-
est, in consideration of the decedent's part of the good
will of this firm. Provided, however, that the said last
preceding inventory shows the net profits of this firm
for the one year preceding such inventory, to have been
not less than ten (10) per cent. of the said total capital
as set forth in the second section of this agreement, and
in case such profits shall have been less than ten (10)
per cent. as last aforesaid, then the decedent's estate
shall be entitled to receive only one hundred ($100.00)
dollars in consideration for the decedent's part of the
good will of the firm.

"14th. In the event of such purchase by the surviving
partners the said survivors shall make payment therefor
by giving the promissory note of the firm of the surviv-
ing partners, for the full amount, to the proper persons
administering upon the estate of such decedent, and
such promissory note shall be payable one year after
the 1st of January following the above death, provided,
however, that at the maturity of such promissory note
the said surviving partners may at their option pay in
cash only one-fourth of its amount, and give their prom-
issory note for the three-fourths of the amount payable
within two years after the first day of January or July
following such death, and at the maturity of this last
promissory note the said surviving partners may, at
their option, pay, in cash only, one-third of its amount
and give their promissory note for two-thirds of its
amount, and such promissory note to be due and payable
within three years after the first day of January or July

following the above said death, and at the maturity of this last said note the said surviving partners may, at their option, pay in cash only, one-half of its amount, and give their promissory note for the other half; such promissory note to be due and payable four years after the first day of January or July following the above said death. And the surviving partners shall also give to the proper persons administering upon the estate of the decedent a bond or bonds, with approved security, conditioned upon the payment of the aforesaid note, and the full indebtedness to the said estate; and all the above said notes shall bear interest at the rate of four (4) per cent. per annum."

Before turning our attention to the specific items which are here the subject of dispute, let us state several inferences which we think necessarily follow from a plain reading of these sections. First: what the surviving partners were to acquire under the agreement was the entire interest of the one dying in all the partnership effects, such interest not to be measured by his share of the capital employed, but to embrace any and all things of value belonging to the partnership in the way of assets. Second: what the surviving partners were to pay in consideration was a sum equal to the deceased partner's interest in such assets after all charges should have been deducted, less such amounts as the deceased partner may have drawn in cash or merchandise, and plus certain items which we shall consider later. Third: the value of these assets was to be determined according to inventory method; in other words, they were to be inventoried and appraised. Fourth: the agreement did not contemplate in such case a special inventory distinct from that which the partnership was accustomed to make in January of each year, but had reference to the inventory of this character made January preceding the death of the partner. The particular inventory made January, 1905, with its valuation, is here accepted, not only as fair and impartial, but

as the inventory which all the parties had in mind. Fifth: the survivors were to pay for the assets as they then existed; that is, at the time of the inventory, and at the valuation then appraised, no matter how much they may have thereafter, before the death, have been depleted or their market value reduced. The expression in the agreement "at the inventory last preceding" simply means at the inventoried price. Sixth: the case on its facts shows an inventory and valuation of assets which, at least to the extent of what it includes, conforms to the requirements of the agreement, is what was contemplated, and is conclusive. Seventh: no necessary implication arises from the language of the agreement that nothing was to be paid for by the surviving partners except those things which had been inventoried by the partnership. Since the entire interest of the deceased partner was to pass to the survivors, clearly whatever was of value was to be paid for, and if any asset remained unscheduled it was to be paid for at its value as well. The agreement indicates as much by expressly providing that one item which never had appeared in any inventory made by the firm before or after the agreement was made, was to be accounted for at a fixed value, viz: "good will."

Does the case show any asset of value not included in the firm inventory, or specifically mentioned in the agreement as an independent asset to be accounted for? Contention is made on part of the personal representatives of the deceased partner that there are several such. We shall consider them in their order. First: they claim as a distinct asset not appearing in any inventory, the enhanced value of the several leaseholds owned by the partnership, the one-fourth of which the court below found to be $58,881.48. The partnership was engaged in conducting a large department store in the City of Pittsburgh. To serve its purposes it secured leases on several adjoining lots of ground extending for different periods at fixed rentals. On these lots it erected at its

own cost a large and commodious building in which the business has been transacted continuously. The location proved most advantageous, and while it does not appear that the rentals fixed in the leases were less than their then value, it is found as a fact that, because of conditions now existing, the value of these leaseholds for their unexpired terms has so increased that they exceed in value the cost to the firm $235,525.92. The court was unable to derive from the agreement, or any of the annual inventories, any intent that this increment was to be regarded as a distinct asset to be accounted for; but, for reasons to which we will refer later, he concluded that such was the intention of the parties, and allowed the estate of the deceased partner the one-fourth of what he found to be the amount of the increased value We think the conclusion so reached unwarranted, in that it subjects the surviving partners to a double charge for the same thing. A careful consideration of the case leaves us in no doubt that in providing in the agreement for the valuation of the "good will," it was contemplated by the partners that whatever appreciation there might be in the leasehold would be embraced in that one item. Assuming that the language employed fairly admits such construction, and approaching the question first from its negative side, we find nothing in the agreement to indicate any different understanding. The agreement is silent as to this increment being a distinct asset. Having in mind the character of the inventory to which the agreement referred and the indeterminate character of this increment, it could not have been contemplated that it would have any place in the inventory. Considering then, that, as found by the court, it exceeds in value by more than $10,000 the one item which, like it, was indeterminate and could not be expected to appear in the inventory—the deceased partner's share in the good will which by the agreement was declared an asset to be accounted for—the fact that the one is specifically charged in the agreement, and no

mention of the other made, indicates, we think, with much certainty that the partners understood that this increment was embraced in the general item of "good will." It certainly would be so included except as otherwise provided, for good will has no meaning except in connection with a continuing business, and oftentimes can have no value except in connection with a particular house, which is unquestionably the case here, the particular house being the one erected by the firm on the leased grounds, paid for by the firm at a cost appearing in the inventory as an asset. If these leaseholds be distinguished from the deceased partner's good will, what element of value is left in the latter for which the survivors are to pay the sum of $58,881.48? Absolutely none so far as we can see. If they do not get the leaseholds in return for the payment of this sum of money, that is, the right to continue the business in the building erected by the firm on its leased properties, they get nothing, not even the right to continue the firm name, for the surviving brothers would have had a right to that which could not have been denied them. Certainly in providing that good will was to be paid for, it must have been contemplated that something of value was to pass to the purchasers that otherwise they would not get; and the question arises, unanswered by the facts so far as we can see, what could have been that thing of value, unless it was the leaseholds? Between the two opposing constructions, one that would include them in good will, a term in legal acceptation sufficient to embrace them, and one that would exclude them thereby leaving good will to stand for nothing of value, the former manifestly should be accepted as expressing the intention of the parties. Approaching the question from its affirmative side, the conclusion just expressed finds strong support in the fact that ordinarily, and in contemplation of law, leaseholds are included in good will except as a contrary intent is discovered. In Elliot's App., 60 Pa. 161, it is held that the good will of an inn

does not exist independent of the house in which it is kept. The learned chancellor avoided the effect of this distinction by regarding it as a dictum of the judge who wrote the opinion, overlooking the fact that the principle is reasserted in Musselman & Clarkson's App., 62 Pa. 81, and in Thackray's App., 75 Pa. 132. In Lindley on Partnership, Sec. 439, it is said that good will has no meaning except in connection with a continuing business. Here a continued business was, of course, contemplated, to be conducted in the same place; which latter circumstance alone made the good will of value. Mr. Pomeroy, in his Equity Jurisprudence, Sec. 1355, says, "The peculiar right, or rather expectancy, called 'good will,' assumes that certain business has been established and carried on at some specific place. It consists in the probability, based upon the habits of men, that the persons who have been accustomed to deal with that business, at that specific place, as well as others, will continue to go to such place and deal in the future. When such business is transferred the good will may be assigned with it." The authorities are concurrent that good will can be associated only with a continuing business, and this implies the right to conduct that business in a particular place  In holding that good will in this place includes the right to the use and enjoyment of these leaseholds, we are, therefore, doing no violence to the language of the agreement, but giving its ordinary and legal signification, and giving meaning as well to a term, which, except as so understood, would be unexplainable in view of the great value attached thereto. We gather from the opinion of the learned chancellor that he would have disallowed this claim made on behalf of the deceased partner's estate but for the fact that years after the partnership agreement was made, the firm entered into a contract with a number of its employees whereby the salaries of the latter were to equal in amount a fixed proportion of the profits of the firm, and in which it was provided that

in determining the amount of profits, "the rise, if any, in the value of the leaseholds" should not be included. If the agreement of partnership we are now considering were obscure or ambiguous it might be that this latter agreement with the employees would be admissible for the purpose of showing by implication that the partners as between themselves treated the increment on the leaseholds as profit; but, we have here an instrument free from ambiguity, except as we translate its terms so as to give them a meaning not ordinarily implied. Not only so, but nothing that can be derived from the latter agreement with the employees which in the remotest way is inconsistent with the position the surviving partners here take that, whether regarded as a profit or not, they were charged with this increment when they were charged with the good will. Certainly no light can be derived from the agreement with the employees on this latter question, and we are at a loss to see any pertinency in it with respect to the present controversy. For the reasons given we sustain the eleventh assignment of error in the appeal of the surviving partners, No. 218, October T., 1912, so far as it relates to the charge against them of one-fourth value of the firm's leaseholds.

We pass to the next item in dispute. The ruling of the court with respect to this is assigned as error by those representing the estate of Jacob Kaufmann, the deceased partner in appeal No. 201, October T., as follows: "Seventh: The learned trial judge erred in his sixth conclusion of law, which is as follows: 'Sixth. The ten (10) per cent. of the decedent's partnership interest was properly calculated upon the amount of Jacob's interest shown by the balance account, less his share of the profits withdrawn by him.'" The reference here is to the ten per cent. allowed for the good will. The language of the agreement with respect to this is, "and further plus an amount equal to ten per cent. of the aforesaid decedents' partnership interest, in considera-

tion of the good will of the firm." We cannot agree with the learned chancellor that the word "aforesaid" as here used refers to the person of the partner dying. We think it clear that the reference is to such party's interest in the net assets of the firm at the inventory last preceding his death. This interest was the one-fourth of the aggregate sum of the inventories made by the heads of the several departments in January, 1905. We are not furnished with these separate inventories, but it is agreed that Jacob's one-fourth in the aggregate of them is correctly given in what is called a "balance account," given to, and accepted by, Jacob 12th June following the inventories, to wit: $389,219.70. This account shows that on that day Jacob received in cash $126,719.70 accumulated profits. This balance account was no part of the inventory, but was simply a statement of settlement between the firm and Jacob, showing first, his share in the net assets of the firm on 1st January preceding, and then the amount charged against him. From the balance thus appearing his share of the profits that day paid him, $126,719.70, is deducted, and the balance so reached was accepted by the chancellor as the value of the net assets on which the ten per cent. was to be calculated. A like balance account was furnished each of the partners at the same time, showing how each stood with the firm. The reason given for calculating the ten per cent. on the balance appearing on this settlement sheet is, that the $126,719.70 on profit accounts represented no part of the net assets. A sufficient answer to this would be that until the net assets had first been inventoried profits could not have been ascertained, and until declared (in this case 12th June, 1905) they were as much a firm asset as was the general merchandise on hand. The inventory on 1st January must have contemplated the possible death of one or more of the partners during the year, for it was understood that upon that inventory, in case of death, that the net value of the assets was to be declared. The balance

account was a settlement with a living partner for his share in the profits previously earned, and could have no place in determining what the partner's share in the net assets was on 1st January preceding. We agree with the contention made on behalf of the estate of the deceased partner in this particular, and hold that the estate is entitled to ten per cent. on the sum of $389,-219.70. This assignment of error is sustained.

Another claim advanced on behalf of Jacob's estate is for participation in what is asserted to be a reserved fund belonging to the partnership. It was the custom of the firm to strike a certain per cent. from the inventoried value of the assets and carry forward the amount so deducted as an asset on a private ledger. These discounts had so accumulated by 1st January, 1905, that they amounted to $169,000. Each year, after the inventory had been made, the amount deducted from the valuation was credited to the several departments, not by way of reduction of the inventoried valuation, but as a distinct credit to the departments. The result may have been the same, but this fact stands out too clearly for dispute, that no such deduction or abatement, however made, or for what purpose, ever entered into any inventory of net assets. It appeared in the accounts of the several departments as a credit, and in the private ledger of the firm, and in the balance account furnished 12th June; but none of these, nor all together, constituted the inventory which was made 1st January, 1905, by which alone the value of the net assets was to be determined. Mr. Blum, the chief book-keeper, testified that the department ledger was charged with the full amount of merchandise as inventoried, and that the discount was there credited (not by those making the inventory, but by the partners themselves) to the several departments. He further testified that in making these inventories the department managers knew nothing with respect to this discount, that it was never taken into consideration by them and had no place in the

inventory. It is impossible to see how a fund so accumulated on paper could become an asset. Certainly, if an asset, whether it had any value at all could only be ascertained on a final winding up of the affairs of the partnership. We are of opinion that no error was committed in rejecting the claim, and this assignment is overruled.

Still another claim is advanced—the right in the estate to participate in the earnings of the partnership between January 1, 1905, and Jacob's death in November following. It is enough to say with respect to this that it is not so written in the contract. Viewing this contract in the light of subsequent events, it may seem, to one not fully acquainted with the considerations which influenced its making, as inequitable in several respects, and this among them. To the partners themselves, however, capable and experienced men of business as they were, knowing the relation of each to the other, and with purposes to be accomplished which concerned only themselves, these provisions which now seem to work injustice to the estate of the partner the first to die, were not only just but essential. These provisions are too plain to be misunderstood, and from the time the agreement was entered into in 1897 down to 1905 they remained unchanged. This contract was the law of the partnership, and the courts can have no power over it except to give it effect according to its own expressed terms. It affords no warrant for the claim made. At the expiration of thirty days following Jacob's death his interest in the partnership, which included all its earnings up to that time, passed to the surviving partners at a price determined by the inventory of the January next preceding. The court so held and disallowed the present claim. In this there was no error.

The question of interest alone remains to be considered. The decree charges the surviving partners with interest on the sum of $268,263.70, at the rate of 4 per cent. from 1st January, 1907, to 22d June, 1911. The

chancellor bases his conclusion with respect to this charge on a finding that because of existing conditions litigation was inevitable; that pending the final settlement of the dispute the surviving partners had tendered Jacob's estate in full settlement $268,263.70, which was refused on the ground that more was owing, and he, therefore, concludes that the surviving partners, because they had the use of this money, should pay interest thereon. He adds, "the partners had fixed the rate of interest at 4 per cent. There was no settled account on which the defendants were in default. The ordinary rule is as stated in Wright v. Hanna, 210 Pa. 349, that when the interest on a note fixed at less than 6 per cent., such rate applies only to maturity and thereafter the legal rate will prevail, but as we have already seen, this was not a case of default and refusal to pay, so we think the rate fixed by the parties is binding."

We think this a proper application of established rules, and the decree in this regard meets our approval. So, too, with respect to the disposition made of the costs.

We find nothing in the decree calling for correction except in the particulars we have above referred to; but because of these the decree must be changed. We, therefore, reverse the present decree and remit the record with instructions that a decree be entered conforming to the views here expressed. The costs in each appeal to be paid by appellants therein.