## FEDERAL LIFE INS. CO. v. WHITE-HEAD.

No. 8729—Opinion Filed June 4, 1918.

Rehearing Denied Sept. 10, 1918.

(174 Pac. 784 )

### 1. Appeal and Error—Trial—Review—Refusal to Reopen Case.

A request to reopen a case for the introduction of additional evidence is addressed largely to the sound discretion of the court, and its ruling thereon will not be disturbed by the appellate court, unless it clearly appears that the trial court abused its discretion.

### 2. Insurance—Powers of Managing Agent—Waiver of Conditions—Notice by Agent of Conditions—Estoppel—Evidence.

Where the insured is in possession of an enforceable life insurance policy, which is surrendered to the state agent for a change in form, and by him forwarded to the home office, which alone has the authority to issue policies, and the home office issues a policy for the same amount but different in form of payment, and at the same time draws up and fills out a supplemental application for the policy without the presence of the insured, in which the previous application is made a part of the supplemental application, and in which material false statements concerning the health of the insured are made, and when so drawn the home office forwards the new policy and the application thus drawn to the state managing agent, who takes both the policy and supplemental application to the home of the insured where he is there examined by the examining physician of the insurer in the presence of the managing agent, and both the physician and agent are truthfully told of the condition of health of the insured, and after being thus truthfully told of the condition of health of the insured; and after a physical examination, the physician wrote in the supplemental application. "Has hepatogenous jaundice caused by falling, and injuring his side. Condition is improving;" and after thus preparing the supplemental application, which contained false statements sufficient to work a forfeiture of the policy, the managing agent presents it to the insured with the request that he sign the same, and upon inquiry by the insured as to what it was, he being a man of limited education, just able to read and write, was informed by the managing agent that it was a mere formality the company required to get the policy changed, he signed it, and the supplemental application was then sent to the home office by the managing agent, who also wrote a letter in which he stated that the gall tubes of the insured were closed and that he had jaundice, and after this notice and knowledge was imparted to both the agent and the company the policy was delivered without objection, and the premium retained—held:

(a) The managing agent had no authority to waive a condition amounting to a forfeiture.

(b) The supplemental application containing false statements which would work a forfeiture, having been prepared at the home office without the presence of the insured, and without him having knowledge of their truthfulness, were the statements of the insurer, and it is estopped to deny their truthfulness.

(c) Notice of a condition that would work a forfeiture of the policy, gained by the

agent while acting within the scope of his authority, is imputable to the company.

(d) That if the insured makes truthful disclosures, concerning a material matter, but the agent, while acting within the scope of his authority, either carelessly or fraudulently writes a false answer, the same becomes the act of the company, and it is estopped from asserting such falsity in its behalf in an action wherein it is involved.

(c) That if the managing agent presents an application for life insurance to the applicant, which the company has already prepared, with a request that he sign it, and is informed that it is a mere formality required by the company before issuing the policy, and he signs it without reading or having it read to him, is not negligent, and where he is a person of little or no education, or does not understand well the language used, he has a right to rely on the statements of the agent.

(f) The court properly allowed the plaintiff to prove that the insured made true statements regarding the state of his health to the agent and medical examiner, and further prove that the managing agent was possessed of full knowledge as to the indisposition of the insured, where it is shown that he never prepared the written application and had no knowledge of its contents, notwithstanding such evidence contradicts the statements contained in the written application.

(g) An insurance company in possession of notice sufficient to work a forfeiture of a policy, which continues to keep and retain the premium paid until after suit is brought to enforce collection of the policy several months after the death of the insured, will be deemed to have waived the forfeiture, and its offer in its answer for the first time to return the premium comes too late.

### 3. Sufficiency of Instructions.

We have examined the instructions of the court to which exceptions were taken, and are of the opinion that they correctly state the law as applied by the facts in this case, and we are also of the opinion that the instructions offered by the defendant were properly refused.

(Syllabus by Springer, C.)

Error from District Court, Johnston County; J. H. Linebaugh, Judge.

Action by Florence Whitehead against the Federal Life Insurance Company. Judgment for plaintiff, and defendant brings error. Affirmed.

B. O. Young, for plaintiff in error.

Alexander Guillett and J. E. Whitehead, for defendant in error.

Opinion by SPRINGER, C. The parties will be referred to as they appeared in the court below. April 22, 1914, John W. Whitehead was a farmer by occupation, 53 years of age, and resided near Tishomingo, Okla. On that day he made application to the Federal Life Insurance Company for a whole life monthly income nonparticipating policy of life insurance on his own life for the sum of $5,000. On the 30th day of April 1914, a policy was issued upon the application previously made, and in the policy the plaintiff was the beneficiary.

The record in this case discloses that the insured was a man of very limited education, being, as the witnesses testified, just barely able to read and write. The application for the life insurance policy was taken at the home of the insured by T. J. Wood, state agent, for the insurer.

In November following the issuance of the policy the insured was afflicted with a malady, and he went to McAlester, Okla., where his brother, J. E. Whitehead, resided, and was there treated for his indisposition by a physician by the name of E. H. Troy. It seems that while the insured was with the brother at McAlester the condition of the life insurance policy was explained to him, and, upon being informed that the policy was payable in monthly installments of $50 each for a period of 100 months, he decided to take advantage of a provision in the policy providing that it might be commuted to a whole life nonparticipating policy payable in a lump sum. Accordingly J. E. Whitehead, as agent for the insured, took the insurance policy to Oklahoma City, and there delivered it to the state manager, Mr. Wood, and requested that it be commuted to a lump sum payment policy. At that time Mr. Wood informed Mr. Whitehead that, if the policy was commuted without the payment of any additional premium, the beneficiary would receive approximately $4,300, and that by the payment of an additional premium of $19.73 the policy would be commuted to a lump sum payment policy for its face value of $5,000. At that time Mr. Whitehead informed the state agent, T. J. Wood, that the insured was in bad health, and could not pass a physical examination, if he were required to do so, and the state manager, Mr. Wood, informed him that he had a right to commute the policy to a lump sum payment for its face value, and that no further physical examination would be required. The record shows at that time Mr. Wood told Mr. Whitehead he knew the insured was in a bad physical condition, and requested Mr. Whitehead to surrender the policy and to pay him the difference amount-

ing to $19.73, and that he would send it to the home office for cancellation, and procure the issuance of a new one in lieu thereof. This transaction took place between the state agent and Mr. Whitehead about the 20th day of November, 1914. The state manager, Wood, mailed the policy to the company at its head office in Chicago for surrender and cancellation, and on the 25th day of November of that year the company issued a full life nonparticipating lump sum policy of $5,000 upon the life of the insured with the plaintiff as the beneficiary, and mailed it to the state agent at Oklahoma City. At the same time there was prepared at the head office in Chicago a supplemental application for the life insurance policy, which the company was that day issuing upon the life of the insured, and that application was filled out in all material respects; all of the questions in it being filled in by answers at the head office, and this application thus prepared was mailed to the state agent, Mr. Wood, with the request that he procure the signature of the insured to the application.

The evidence in this case discloses the fact that at the time J. E. Whitehead delivered the first policy to the state agent for surrender and cancellation, and informed him of the indisposition of the insured, that he told the state agent to inform the defendant of the true conditions. Some days later, perhaps about the 28th or 29th of November, 1914, after receiving the policy and the application duly filled out with all questions answered at the head office, the state agent went to the home of the insured, near Tishomingo, taking with him one Dr. H. B. Kniseley, and there requested the insured to sign the supplemental application for the life insurance policy, and had Dr. Kniseley make a physical examination of the insured. The only change of any kind or character made by either Dr. Kniseley or the state agent, T. J. Wood, was, "Has hepatogenous jaundice caused from falling and injuring his side. Condition is improving now." After the application had thus been filled out at the head office on the 25th day of November, 1914, and changed by the physician of the defendant, it was presented to the insured with the request that he sign it. Upon being thus requested, he asked Mr. Wood what it was they wanted him to sign, and the insured was informed by him that it was a mere formality the defendant requested in order to get the policy changed, and that it would in no way affect the policy, and, if he did not get a new policy, the old one would be returned to him. After being thus informed, the insured signed the application.

It seems that the state agent had with him

at the time the policy issued by the company on the 25th day of November, 1914, but, instead of leaving the policy with the insured he took it and the supplemental application with him to Oklahoma City. This record discloses that the state agent mailed the supplemental application to the defendant at its head office in Chicago, but just when the record does not show. However, on the 21st day of December, 1914, the state agent wrote the company a letter as follows:

"Federal Life Insurance Company, Chicago.

"Isaac Miller Hamilton, President. T. J. Wood, State Manager, 313 Patterson Building, Oklahoma City, Okla.

"Dec. 21st, 1914.

"Mr. Chas. S. Rannells, Sec'y Federal Life Insurance Co., Chicago, Ill.—Dear Mr. Rannells: Please send me a photograph copy of the application for change of policy of John W. Whitehead. The policy which is now in force is No. 32300, which is in lieu of policy No. 31449.

"When Mr. Whitehead signed the application for change of policy he was suffering from a closing up of the gall tubes or something of that kind Dr. Kniseley inserted in his change of application what that was and I forgot to have him put it in the amended application which is attached to the policy. Therefore I would like to have the copy, either photographed or made on the typewriter, to attach to the policy in order to make it complete.

"With best wishes, I am yours very truly,

"T. J. Wood, State Manager."

After the letter was written, on the 21st day of December, 1914, the policy sued on in this case was on December 26, 1914, delivered by the state agent to W. A. Jennings, agent for the insured. The insured died on the 16th day of January, 1915. Proof of death was duly made and payment of the policy refused.

Plaintiff filed her original petition on April 17, 1915, which alleged the execution and issuance of the policy and all the necessary formal allegations, with a prayer for judgment for $5,000.

On the 18th day of May, 1915, the defendant filed its answer, in which it pleaded various and sundry stipulations contained in the original and supplemental application, and alleged that they were conditions precedent, and that they had all been violated by the insured by making false answers to the ques-

tions and by failing to disclose the true facts, and specifically alleged:

"That in said original application said John W. Whitehead falsely and fraudulently represented to said defendant that during the winter of 1913 he had been treated by one Dr. J. L. Ledgerwood for la grippe, when in truth and in fact he had not been treated during the winter of 1913 for la grippe by Dr. Ledgerwood, but that during that time he had been treated by the said Dr. Ledgerwood for rheumatism; and said John W. Whitehead further falsely and fraudulently represented to said defendant that he had not consulted, been prescribed for, or treated by any other physician than the said Dr. Ledgerwood within the past five years, when in truth and in fact said John W. Whitehead had consulted, been prescribed for, and treated by several physicians other than the said Dr. Ledgerwood, among said physicians being Dr. Britton and Dr. Hardy, during and within the past five years; and the said consultations, prescriptions, and treatments were for illness of a character to permanently affect the health of the said John Whitehead, and to render him more susceptible to the attack of disease; which representations more fully appear from a full, true, and complete copy of said original application above mentioned, which is hereto attached, marked 'Exhbit A,' and made a part of this answer.

"That in said supplemental application dated November 25, 1914, it was further agreed, by and between the said defendant and the said John W. Whitehead that said supplemental application should be held and considered as an amendment to the said original application, and that said original application should be held and considered a part of said supplemental application, and that each and every statement contained in said supplemental application should be taken as full, true, and complete in every respect.

"That in said supplemental application said John W. Whitehead falsely and fraudulently represented to said defendant that he was at that time, November 25, 1914, in good health, except that he had hepatogenous jaundice, from which he was then improving, when in truth and in fact said John W. Whitehead was not in good health, but had the disease of piles and the disease of cancer of the liver, and was sick and ill and suffering from such bad health that he was not expected to live but a short time longer, and his condition, instead of improving, was constantly and rapidly declining and becoming worse and worse.

"The said John W. Whitehead further falsely and fraudulently represented to said defendant in said supplemental application that he had not suffered any sickness, ailment, or disease whatever, except hepatogenous jaundice, since the 22d day of April, 1914, when in truth and in fact the said John W. Whitehead had suffered sickness, ailments, and various diseases, and had the disease of piles and the disease of cancer of the liver.

"The said John W. Whitehead further falsely and fraudulently represented to the said defendant in said supplemental application that since the 22d day of April, 1914, he had not consulted or been prescribed for by any physician or professionally treated by any one, when in truth and in fact the said John W. Whitehead had consulted, and been prescribed for and professionally treated, and was actually being professionally treated at that time by Dr. J. L. Ledgerwood, Dr. E. H. Troy, and other physicians, whose names at this time are unknown to this defendant, which representations more fully appear from a full, true, and complete copy of said supplemental application above mentioned, which is hereto attached, marked 'Exhibit B,' and made a part of this answer. * * *

"For further answer said defendant alleges and states that it was further provided by said original application, and it thereby became a part of the contract between said defendant and the said John W. Whitehead, that said policy of insurance should not take effect until the said policy of insurance should be delivered to the said John W. Whitehead while he was in good health, and that said policy of insurance was not delivered to the said John W. Whitehead until the 26th day of December, 1914, at which time the said John W. Whitehead was not in good health, but was sick and ill, and suffering from the disease of piles and the disease of cancer of the liver, from which disease he died on or about the 16th day of January, 1915; that the illness of the said John W. Whitehead was not merely a temporary indisposition, but that said illness was of a character to permanently affect the health of the said John W. Whitehead and to render him more susceptible to the attack of disease; that said policy of insurance was not delivered to the said John W. Whitehead while he was in good health, and that it never became effective as a contract of insurance, and that said policy is null and void and of no effect; that when said policy was delivered to said John W. Whitehead he well knew he had the disease of piles and the disease of cancer of the liver, which facts it was his duty to disclose and make known to this defendant, but that said John W. Whitehead not only concealed and withheld said facts from said defendant, but he falsely and fraudulently represented to said defendant that he was in good health, except hepatogenous jaundice, from which he was improving; and that said defendant was never informed and never knew that said John W. Whitehead was not in good health and had the disease of piles, the disease of cancer of the liver, or any other disease, and that had this defendant known that said

John W. Whitehead had the disease of piles and the disease of cancer of the liver, and was not in good health on the said 26th day of December, 1914, said defendant would not have delivered said policy to the said John W. Whitehead; and said defendant did not discover the perpetration of said fraud until it received the plaintiff's proofs of the death of the said John W. Whitehead, and until said defendant subsequently made a thorough investigation of the true facts and circumstances in this case."

On May 26, 1915, the plaintiff filed her reply in which she denied each and every allegation of the answer, and further pleaded in a very exhaustive manner, notice, waiver, and estoppel on the part of the defendant. The reply being attacked by the defendant on the grounds that it was a departure, the plaintiff asked and obtained leave of the court to file her first amended petition, and in it she pleaded, in a very elaborate way, the making and delivery of the policy, the payment of the premium, the death of the insured, notice and proof, and in a very exhaustive manner pleaded facts constituting notice, waiver, and estoppel on the part of the defendant.

On May 8, 1915, the defendant refiled its previous answer, and on December 8, 1915, the plaintiff filed her amended reply.

The issues being thus joined, the case was tried to the court and jury on the 9th day of May, 1916, and resulted in a verdict in favor of the plaintiff. In due time a motion for a new trial was filed and presented to the court, and, it being overruled and exceptions saved, the case is now properly before us for review.

Realizing the importance of this case, counsel on both sides have filed very creditable and exhaustive briefs. The defendant relies upon several assignments of error relating to the action of the court in permitting the plaintiff to reopen her case for the introduction of additional evidence; the admission of evidence and overruling the demurrer to the evidence of the plaintiff; the refusal to direct a verdict for the defendant; and the instructions of the court to the jury. The action of the court in overruling the demurrer to the evidence and the admission of the testimony, and the refusal to direct a verdict in favor of the defendant, present practically the same question.

At the close of the evidence for the plaintiff the defendant interposed a demurrer which was presented to the court, and before ruling thereon the plaintiff asked leave to reopen testimony, which was by the court

granted, and the defendant says that by so ruling the court erred.

It is the duty of a party in the trial of a case to introduce all his evidence before resting, but a request to reopen the case for the introduction of additional testimony after a party has rested is addressed largely to the sound discretion of the trial court, and the action of the court thereon will not be disturbed by this court unless it is made to appear that the trial court abused its discretion. There being nothing in this record which shows the arbitrary or oppressive exercise of judicial discretion on the part of the trial court, its ruling in the instant case will not be disturbed.

We will next deal with the action of the court in its admission of evidence, and upon the demurrer of the defendant to the evidence of the plaintiff, and upon a motion of the defendant for a requested verdict.

Upon the trial of the case Dave Whitehead testified:

"Q. What relation are you to John W. Whitehead? A. He was my father. Q. When did John W. Whitehead die? A. January 16, 1915. Q. What condition was his health on April 30, 1914? A. His health was good. The best it had been in several years. Q. Were you at home on or about November 25, 1914? Remember a visit there of T. J. Wood and Dr. Kniseley? A. Yes, sir; I was there. Q. For what purpose were they there? A. To have the policy changed. They said it was a formal matter with the company. In order to get this policy changed that they would have to do this to get it changed, and asked him about himself and where he had been, and he told them, and he said that he had been to McAlester and had Dr. Troy treating him and that he advised him to go to Hot Springs. Q. How long did Mr. Wood and Dr. Kniseley remain in the house that day? A. They were there an hour or better. Q. How long did they talk to your father? A. They talked with him about all of that time. Q. I will ask you to state whether or not your father told them his condition? A. He did. He told them that he had been to McAlester and that Dr. Troy had been treating him, and that he advised him to go to Hot Springs, and also that Dr. Ledgerwood advised him to go to Hot Springs. Q. State what statement was made by your father to Dr. Kniseley and Mr. Wood on this occasion as to whether he was in good or bad health? A. He told them that he was in bad health. Q. I will ask you to state whether or not your father was asked by either Dr. Kniseley or Mr. Wood, on that occasion, to sign any paper or supplemental application? A. Yes, sir. Q. Did your father sign this supplemental application? A. Yes, sir. Q. Did Dr. Kniseley write a line or two on that supplemental application? A. Yes; I think

so. Q. What was said by either Mr. Wood or Dr. Kniseley to your father about his signing the paper? A. He told them that the company required that in order to have the policy changed and that that would not affect the old policy in any way whatever; if he did not get the second policy, the old policy would remain good. Q. Did they say anything at that time about the rules of the company? A. Yes; they said that the company required that in order to have the policy changed. Q. Did either Mr. Wood or Dr. Kniseley read that paper to your father at that time? A. No, sir. Q. Did your father read that paper? A. No, sir. Q. What was the condition of your father relative to being an educated or an uneducated man? A. Well, he did not have any education at all to amount to anything; could just barely read and write."

Florence Whitehead testified in substance:

"I am Florence Whitehead, the plaintiff in this action. I live a mile and a half south of Tishomingo. John Whitehead, who is now dead, was my husband. We were married in 1887, and lived together until the time of his death. On April 30, 1914, his health was good. On the 25th day of November, 1914, his health was very bad; he had malaria and was yellow with jaundice. On or about the 25th of November, 1914, Mr. Wood and Dr. Kniseley visited our home and stated that they came to talk to and examine Mr. Whitehead. They stayed about an hour, which was mostly spent talking to Mr. Whitehead. My husband told Mr. Wood and Dr. Kniseley that he was in bad health and had jaundice; that his heart bothered him; that he had piles; that his side hurt him, and that he had been thrown from a horse, and injured his side, which he thought caused his other troubles. Q. What did your husband say to these gentlemen about consulting physicians? A. He said he had been to McAlester, and Dr. Troy treated him, and he told him that he had better go to Hot Springs, and Dr. Ledgerwood told him the same, and he intended to go down there; that he thought he would be helped by going. Q. State whether or not these gentlemen asked him to sign any paper? A. Yes, sir. Q. What did they state that it was? A. They said it was just a form the company had asked him to sign in order to have this policy changed, and if it was not changed he would get back the old original policy. Q. State whether or not your husband could read and write? A. Yes, sir; he could just barely read and write."

J. E. Whitehead, a witness for the plaintiff, testified:

"I am J. E. Whitehead. The plaintiff, Florence Whitehead, is my sister-in-law, and John W. Whitehead was my half-brother. Q. Do you know anything about the facts and circumstances connected with the insurance policy sued upon in this case? A. Yes,

sir. Q. Tell the jury, in your own way and of your own language, all the facts and circumstances that you now remember. Q. You may state what, if anything, you did with reference to the insurance policy in connection with this case? A. I took that policy and put it in my grip and took it with me to Oklahoma on a trip I was making. While in Oklahoma City I visited T. J. Wood, who was state manager for the Federal Life Insurance Company, at his office. I told Mr. Wood that I desired to make application to have that policy commuted to a lump sum payment instead of the monthly payment of fifty dollars a month for one hundred months. I asked Mr. Wood to send that policy to the company and notify them of his health, which was, at that time, bad, and to request for him a commutation of this policy. I told Mr. Wood that John W. Whitehead was not in a physical condition to stand a medical examination or to furnish a certificate of good health; that he had jaundice. I told Mr. Wood that John W. Whitehead was in awful bad shape physically, and that he was at my home in McAlester being treated by Dr. Troy, and that I wanted the company to know the full facts. That Mr. Wood answered me and said: 'I know your brother's physical condition, I saw him the other day; and I may lose $5,000 by inducing him to take that policy.' Mr. Wood said to me: 'That man is going to die; I can read death in his face. It would be a miracle if he got well, but he is entitled to this change. Give me that $19 and I will give you a receipt for the policy and send it in and inform the company of the situation.' Mr. Wood said that if the company refused to renew this policy or change it by reason of his health why, of course, the old policy would be returned. He said the rules did not require an examination in cases of that kind, and said that he would send it into the company and report all I said. At that time I wrote him this check for $19.73 and delivered it to him. Q. Was any tender of the premium ever made to you? A. No tender of the premium under this policy has been made until yesterday, the 9th (8th) day of May, 1916, when Mr. Young tendered to me the $228.65 in gold in the clerk's office in the court house, which I refused."

T. J. Wood, a witness for the defendant, testified:

"Q. I will ask you to state, if you remember, the time when Mr. J. E. Whitehead called at your office, and of a conversation that you had with him regarding the canceling of the first policy issued by your company on the life of John W. Whitehead and making an application for change of policy? A. Yes, sir. Q. I will ask you if Mr. J. E. Whitehead stated to you at that time that John W. Whitehead had jaundice and that he was being treated by Dr. Troy? A. I don't think he did. Q. Did J. E. Whitehead state to you at the time that John W. Whitehead was in

such a bad physical condition that he could not stand another physical examination? A. He did not. Q. I will ask you to state if J. E. Whitehead requested you to notify your company of the condition of John W. Whitehead? A. No, sir. Q. I will ask you to state what was said by J. E. Whitehead and what was said by you in reference to the request made for a change of this policy? A. J. E. Whitehead said he wanted to pay a note that John W. Whitehead owed, and I told him the note was down here in the First National Bank at Tishomingo, and he said he had the first policy issued with him, and he wanted that sent in and have it commuted to a lump sum. Then he said that his brother was in bad shape, and I said 'yes; I know that he has got jaundice, but I don't think jaundice amounts to anything.' I said, 'If you want to commute this policy, the best thing would be to take a new policy. It will cost you $19 50 difference, as I remember, and it is up to the company whether they will commute it or not. He paid me the $19, and I sent it to the home office and requested that a $5,000 be issued in lieu thereof. Q. When did you send the first policy to the company? A. Probably November 22, 1914. Q. Mr. Wood, have you any paper in your possession at this time from which you can tell us what time that policy was mailed to you? A. Yes, sir; I think I can answer that; it was about the 29th of November, 1914. Q. Mr. Wood, did you at any time prior to the death of John W. Whitehead advise the Federal Life Insurance Company that he was sick? A. Yes, sir; I think I did, by application for change of policy only. Q. When did you do it? A. December 21, 1914. Q. You state, Mr. Wood, that you received the last policy from the company about November 29th? A. Yes; I think that is about the date; judging from the letter. Q. Mr. Wood, when you received the policy on or about November 29, 1914, what did you do with it? A. Why some time later than that, I don't know when it was, I delivered the policy to Mr. Jennings. He came over and said, at your request, that you had telephoned him that you asked him to get the policy and give me a check (receipt). Q. At that time did you take a receipt from Mr. Jennings for the policy? A. I think I did. Q. I will hand you 'defendant's Exhibit 1,' and ask you if that is the original receipt you took from Mr. Jennings? A. I should say it is. Q. What is the date of it? A. December 26, 1914. Q. Then you had that policy from about November 29, 1914, until December 26, 1914? A. Yes. Q. Why didn't you mail that policy to the assured, John W. Whitehead? A. Because an amended application had to be signed and forwarded to the home office. Q. Did you mail that application into the home office after you got it signed? A. Yes, sir. Q. By whose authority did you take that amended application? A. I would say that it was the authority of the home office. Q. State for what purpose you and Dr. Kniseley went out to Mr. John

Whitehead's residence in November, 1914. A. There were three reasons: I wanted to see Mr. John W. Whitehead and have him sign the amended application; I wanted to write Dave Whitehead a policy of life insurance; I wanted Dr. Kniseley to insert in this amended application the condition of John W. Whitehead, so as to keep him from signing an amended application that did not show that he was not in good health. Q. Did you forward the application for change of policy with your letter requesting such change? A. No, sir; just the letter. Q. When, for the first time, did the company receive the application for change of policy which is marked plaintiff's 'Exhibit C,' which I hand you for examination? A. This seems to have been dated November 25, 1914, and that I think was the time it was sent out of the home office. Q. You stated you sent a letter requesting a change of policy? A. Yes, sir. Q. Did you send this application for change of policy, which is plaintiff's Exhibit C, along with that letter at that time? A. No, sir; I did not. Q. When did you send plaintiff's Exhibit C to the company? A. As near as I can get at it, December 21, 1914. Q. I will ask you if the company was notified at any other time and in any other manner that the insured had jaundice, other than by the notice of this application for change of policy? A. No, sir; I think they were not. Q. Did you receive anything further from the company about that time relative to this application? A. Yes, sir; I received that amended application. Q. Was that amended application prepared by the company? A. Yes, sir. Q. And mailed to you? A. Yes, sir. Q. Did you have that amended application executed on the 25th day of November, 1914? A. No, sir; I guess it must have been later than that, because that was the date at the home office, November 25, 1914, and it was probably several days—it might have been a week or more afterwards before I was down there. Q. Did you date that paper the day this examination was made? A. No, sir. Q. Did the company arbitrarily put a date on there before they sent it out? A. The company put the date on it just like it is there. Q. And sent it to you to get it signed? A. Yes, sir. Q. This purports to be made on the date that the company dated it in Chicago? A. Yes, sir. Q. And in fact it was not made until later on? A. It was not signed until later. Q. And that other was not written in it (that he had jaundice, condition improving)? A. No, sir. Q. Who wrote these two lines it it with a pen? A. Dr. Kniseley. Q. Did he write that in there when he was at the home of John W. Whitehead? A. He did. Q. The company, at the time it issued this last policy under date of November 25, 1914, had no written application on which to issue it, did they? A. No, sir. Q. But they prepared this supplemental application and dated it themselves the same date and sent it to you with the policy? A. Yes; that is customary. Q. They told you to get this sign-

ed and deliver the policy? A. I think they said to have it signed; if they did not, it was understood that it was to be signed. Q. Did you have authority to deliver the policy? A. I think so. I did do it. Q. Was Dr. Kniseley the regular examining physician at Tishomingo? A. Yes, sir. Q. By whom was he appointed? A. By the medical director of the company."

There was an objection made by the defendant to practically every question asked, which was overruled by the court and exceptions saved, and the admission of this testimony is now urged as error.

The plaintiff also offered in evidence as Exhibit B the following receipt for the premium paid:

"Premium, $228.65.
"Federal Life Insurance Company,
Chicago, Illinois.

"Received, two hundred twenty-eight 65-100 dollars being the —annual payment upon the policy No. 32300 issued upon the life of John W. Whitehead continuing said policy in force until the 30th day of April, 1915.

"This payment, if made when overdue, will not be valid in continuing the policy, unless the party insured is in good health at the time, and if note be given for said premium or any part thereof, nonpayment of such note at maturity will void said policy. Unless issued at the home office, this receipt to be valid must be countersigned by a duly authorized agent of the company.

"W. E. Brinstien, Assistant Secretary.

"Paid in Oklahoma City, this 26th day. of December, 1914. T. J. Wood, State Manager. "Countersigned."

The original application for the first policy issued among other things contains:

"Have you ever had * * * rheumatism, acute or chronic? * * * No. * * * Disease of the rectum? No. * * * Have you personally consulted any physician, been prescribed for or treated within the past five years? If so, state when, by whom, and what for? Yes, winter 1913. Who is your usual medical advisor? Dr. J. L. Ledgerwood. Address, Tishomingo. What physician did you last consult? Dr. Ledgerwood. Address, Tishomingo. When did you consult him? Winter 1913. For what? La grippe."

"I agree that no statements, promises, representations, notice, or information made or given by or to the persons soliciting or taking this application, or by any other person, shall be binding on said Federal Life Insurance Company or in any manner affect its right, unless the same be reduced to writing, made a part of this application, and approved by the president. vice-president, or secretary of said company. * * *

"I agree that each and all of the statements and answers contained in this application, consisting of Parts I and II, are full, true. and complete in every respect, and are offered to said company as a consideration for a contract of insurance, which shall not take effect until the policy shall have been actually delivered to me and the first premium shall have been actually paid during my life and while I am in good health."

The supplemental application for the policy sued on in this case, among other things, contains the following provision:

"Please change my original application for insurance, dated the 22d day of April, 1914, on which Policy No. 31449 for $5,000 was issued, to a policy of insurance for five thousand dollars ($5,000.00) on the non par life plan, with an annual premium of $228.65, and issue policy thereon at my present age, 53 years. I hereby state that I am now in good health, that I have not met with any accident or suffered any injury, sickness, ailment, or disease whatever, or consulted or been prescribed for by any physician, or professionally treated by any one, since the date of said application, except, to wit:

"Has hepatogenous jaundice caused from falling and injuring his side. Condition is improving now."

The original and supplemental applications were both attached to and made a part of the answer in this case, and they were both likewise attached to and made a part of the insurance policy sued on in this case.

The objection made to the introduction of the testimony, and which was also raised by the demurrer and the motion for a directed verdict in favor of the defendant, was upon the ground and for the reason that the evidence was contrary to the express conditions of the policy, "that the agent shall not waive any condition in the policy; that the only way that any condition may be waived was in writing and indorsed on the policy and accepted by the president or vice president of the company." And for the further reason that the evidence tended to show knowledge or information imparted to the agent, and thus prove a waiver, without first proving that the agent had authority to make such waiver; and, further, that the evidence was incompetent, immaterial, and irrelevant. We cannot agree with the contention of the defendant that this evidence was incompetent and inadmissible. This evidence was incompetent for the purpose of proving a waiver because of its direct contradiction of the provision of the policy sued on in this case, the agent having no authority to make such waiver.

This court has held a number of times that an agent having authority to solicit in--

surance policies and take application therefor and transmit the same to a superior officer, who alone has authority to issue the policy, has no authority to waive any condition in the policy that would avoid it.

"A stipulation in a policy that no agent has power to waive forfeiture, and that no waiver or alteration shall be binding unless in writing and signed by a specified officer or officers, is valid and binding on the insured, and prohibits a waiver by an agent; and this is true even though the policy does not expressly limit the power of the agent, as the express delegation of the power to waive to a designated officer involves a denial of such power to the agent." Liverpool & London & Globe Ins. Co. v. Richardson, 11 Okla. 579, 69 Pac. 936.

"An agent for a fire insurance company whose powers are strictly defined and limited by the express terms of the contract of insurance cannot act so as to bind his company beyond the scope of his authority." Deming Inv. Co. v. Shawnee Ins. Co , 16 Okla. 1, 83 Pac. 918, 4 L. R. A. (N. S.) 60.

It is well, however, to keep in view the fact that there is a vast difference between notice or knowledge and waiver.

Notice is information of a condition affecting an existing right.

Waiver is the surrender or relinquishment of an existing right. Waiver may be effected voluntarily by an affirmative act by one having authority indicating an intention to waive and need not necessarily be preceded by notice; or waiver may be effected by the omission or failure of a party to assert in his behalf an existing right, which must be preceded by notice. The law enjoins upon all men the necessity to talk when they should talk, or they will not be heard to talk when they want to talk, and here the doctrine of estoppel arises.

An estoppel may be said to arise when a person is concerned in or does some act either of record or in pais which will preclude him from averring anything to the contrary. An agent may have notice of a condition that would waive forfeiture, and yet not have authority to make the waiver. The precise question here presented is whether notice to the agent without authority to waive a forfeiture is notice to the company. It cannot be denied that the agent was acting within the scope of his authority when he became possessed of information of a condition that would waive a forfeiture of the policy in this case.

"As a general rule, notice to the agent and knowledge obtained by him while acting within the scope of his authority is notice to the principal. This applies to insurance companies and their agents respecting material facts affecting the risk, and such companies are estopped from asserting the invalidity of the policy at the time it was issued for the violation of any of the conditions of the policy if at the time it was so issued the fact of such violation was known to the company or its duly authorized agent. So when the facts communicated to the agent had relation to or arise from the subject-matter of the agency, the presumption exists that the agent had communicated such facts to his principal. This is true whether the agent actually does so communicate such facts or not. It also correctly holds where the agent's failure so to do arose from mere neglect or ignorance, or whether the notice to the agent is actual or constructive. In case of special or class agents whose duty is to communicate certain facts to its directors or managing agents, notice to them of such fact is notice to the company. The force of the above statement is more apparent for the reason that as a legal entity the only knowledge or information the insurance company can acquire must be obtained through its agents." Joyce on Insurance, § 515.

In the case of Powell v. Cont. Ins. Co., 97 S. C. 375, 81 S. E. 654, where a defense to an action upon a fire insurance policy was that the insured had forfeited the policy, the court said:

"Knowledge of the fire insurance agent within the scope of his agency that an insured had removed the insured property, contrary to the terms of the policy, was imputable to the principal."

In the case of Schaeffer v. Farmers' Mutual Fire Ins. Co. of Dug Hill, Carroll County, 80 Md. 563, 31 Atl. 317, 45 Am. St. Rep. 361, where a defense was made to an action upon the fire insurance policy that the policy had been forfeited by the insured, the court said:

"That the notice to the general agent was notice to the company, it being his duty to communicate it, and the refusal of the agent to give the permit asked for made no difference, because no permit was needed."

There is another very important feature in connection with the testimony in this case. We are forced to the conclusion from this record that the policy issued on the 30th day of April, 1914, was enforceable and collectable at the time it was surrendered for cancellation to the state agent on or about the 21st day of November, 1914. It is contended by the defendant that the insured made false answers in his application under date of April 22, 1914, in that the insured stated that he had never had rheumatism, and that he

had not consulted or been prescribed for by any physician within the last five years except Dr. Ledgerwood, in the winter of 1913, for la grippe, and that these answers were false and untrue because the insured had consulted and been prescribed for by Dr. Hardy and Dr. Britton, and that he had been treated for rheumatism by Dr. Ledgerwood. The record in this case is totally wanting in any evidence whatever to prove the allegations of the defendant, and the burden was upon it to establish that fact. The only statement anywhere in the record that the insured had ever been affected with rheumatism is the statement of Dr. Ledgerwood contained in proof of death, made out and filed with the company:

"Were you his medical attendant or adviser before his last illness? If so, for what disease and when? I attended deceased about two years ago for rheumatic condition."

It is within the common knowledge of all men that there is a great deal of difference between rheumatism and a rheumatic condition. The insured answered that he was treated in 1913 by Dr. Ledgerwood for la grippe, and la grippe might very well produce a rheumatic condition.

Upon the trial of this case there was not introduced any evidence whatever which proved, or tended to prove that the insured had rheumatism or that the statement made by him in his application was not true. There was no evidence whatever introduced which proved, or tended to prove, that Drs. Britton and Hardy had ever been consulted by or prescribed for the insured. In her reply the plaintiff made a specific denial of all the affirmative allegations contained in the answer. Then, after she had made the denial, she further alleged:

"And said plaintiff for her second and further reply to the answer of the said defendant Federal Life Insurance Company, filed herein, states: That even if it were true that the said assured, John W. Whitehead, did execute and deliver the original and supplemental applications, marked Exhibits A and B, and attached to the answer of the said defendant, and even, if it were true that certain answers and statements contained in the said original and supplemental applications were untrue and erroneous and false as alleged by defendant in its answer filed herein, that the said answers to each and all questions contained in the said original and supplemental applications were written by the state manager for the defendant, one T. J. Wood, and by the examining physician, employed by and representing the defendant, one H. B. Kniseley, and were not written by said defendant's officers and agents as dictated and as answered by the said assured, John W. Whitehead."

The defendant seems to take the reply as admitting the truthfulness of his allegations that the insured had made false statements in both his original and supplemental applications, and therefore offered the reply in evidence to prove the facts alleged in its answer. Properly construed, this reply cannot be held to be an admission of any of the allegations contained in the answer, but, on the contrary, it is a positive denial of such allegations. The defendant offered no other evidence whatever to support any of the allegations of its answer with reference to the false statement contained in the original application. In connection with the supplemental application, several very important and as well interesting propositions arise.

The policy sued on in this case was issued on the 25th day of November, 1914; the supplemental application is dated November 25, 1914; the testimony of T. J. Wood conclusively shows that immediately after the first policy issued was surrendered to him by J. E. Whitehead for cancellation, on the 21st day of November, 1914; that he sent the policy to the home office in Chicago, and that within a few days he received both the supplemental application and the insurance policy that is sued on here, duly filled out in every respect and particular, except the notation thereon, "Has hepatogenous jaundice caused from falling and injuring his side. Condition is improving now."

The testimony of Mr. Wood shows that within several days—perhaps a week—after receiving them, he took the supplemental application and the insurance policy and went from Oklahoma City to Tishomingo to the home of the insured, and that he took Dr. Kniseley from Tishomingo to the home of the insured with him. The testimony conclusively shows the only change or alteration of any kind or character made in the supplemental application was as above stated. The testimony of Dave Whitehead and of the plaintiff in this action conclusively shows that when this supplemental application was presented to John W. Whitehead by the state agent, Mr. Wood, that the insured asked him what it was, and that he was told by Mr. Wood that it was a mere formal matter that the company required to get the policy changed, and upon that statement and representation being made to the insured he signed this supplemental application. Before this supplemental application was signed by the insured the evidence in this case conclusively shows that Mr. Wood had been fully informed of the condition of the health

of the insured by J. E. Whitehead on the 21st day of November, 1914. The evidence of Mr. Whitehead is that Mr. Wood told him:

"I know your brother's physical condition. I saw him the other day, and I may lose $5,000 by inducing him to take that policy. That man is going to die; I can read death in his face."

The testimony of Mr. Wood upon that particular point is as follows:

"* * * That his brother was in bad health."

And he said:

"I know that he has jaundice, but I don't think jaundice amounts to anything"

The testimony of Dave Whitehead and the plaintiff in this action further shows that, at the identical time the supplemental application in this case was signed, Mr. Wood and Dr. Kniseley were at the home of the insured for a period of about one hour, during which time the insured informed them that he was a very sick man; that he had been to McAlester under the care of Dr. Troy, and that Dr. Troy advised him to go to Hot Springs, Ark., and that he had also been under the care of Dr. Ledgerwood, who had also advised him to go to Hot Springs, Ark., and the testimony of all the parties, including Mr. Wood, conclusively shows that Dr. Kniseley made a thorough examination of the insured, and all of this information, including that obtained by Dr. Kniseley in his physical examination of the insured, was imparted to the duly authorized agent of the defendant while acting within the scope of his authority, and under the rule announced, supra, we must hold the company at that time to have been possessed of full notice and knowledge regarding the health of the insured. The supplemental application having been prepared at the home office of the defendant without the presence of the insured, and having been presented to him for his signature by the state agent of the defendant with the assurance that it was a mere formal matter the company required to change the policy, without it having been read to the insured, and without his having read it, did not become the statements and representations of the insured, but were the statements and representations of the defendant, and it is conclusively bound by its own statements.

The record discloses fully that no false statements or representations of any kind or nature whatever were made by the insured, except the signing of the supplemental application. The law is well settled, by a long list of unbroken authorities, that where the insured makes truthful disclosures, and the agent, acting within the scope of his authority, erroneously or fraudulently makes false answers for him, that the company is bound by the acts of its agent.

"An applicant for insurance without knowledge to the contrary may assume that the agent has prepared the application according to agreement, and that the company has written the policy according to the application, and he is not negligent in failing to examine such instruments for errors and omission.

"It is the duty of such an agent to prepare the application of a person solicited to insure so that it will accurately and truthfully state the result of the negotiations, and the agent's failure to do so, in legal effect, the fault 'or act' [our insertion] of the company.

"Agreements made between such an agent and a person whom he solicits to take insurance, as to what the application shall contain, are, in legal effect, made with the company, and bind it as to the contents of the application." Adam Pfiester v. Mo. St. Life Ins. Co., 85 Kan. 97, 116 Pac. 245.

"If such an agent fail to write into the application an agreement which he has made with the applicant respecting the terms of the insurance desired, his knowledge of the agreement is in legal effect the knowledge of the company." Ib.

"Where the agent of the company made inquiries of the owner as to the property and took note of his answers, which were correct, and where, after having prepared the policy, and just before delivering it, the agent handed to the owner a printed application in which the agent had himself written the answers, and told the owner to sign the application, which the latter at once did in presence of the agent, without reading it or knowing its contents, the misrepresentation of a material fact in such application would not necessarily enable the insurer to avoid payment of the policy." Dahlberg v. St. Louis Mutual Fire & Marine Ins. Co., 6 Mo. App. 121.

"When an applicant for life insurance, in answer to a question, states the facts fully and truthfully, and the agent of the company, authorized to ask the question and write the answer, putting his own construction on such facts, deduces therefrom an erroneous answer, which he writes down, assuring the applicant that it is the proper answer upon the facts stated, and the one the insured wants, the insured is not precluded by his warranty in the application from showing the facts and circumstances under which the answer was made, and when so shown the insurer is estopped from questioning the truth of the answer.

"The same rule obtains where the appli-

cant answers fully and truthfully, and the agent of the insurer, charged with the duty of asking the questions and writing the answers, abbreviates an answer, or omits part of it.

"A provision in a life insurance policy withholding from the agents authority 'to make, alter, or discharge this or any other contract in relation to the matter of this insurance,' does not limit the powers of the insurer's agents in preparing and accepting an application for insurance." Mutual Benefit Life Ins. v. Robison, 58 Fed. 723, 7 C. C. A. 444, 22 L. R. A. 325.

"If the insured gives correct answers to the only questions asked of him, and the agent who fills the blank inserts in the application answers to the questions not asked of the insured, and insured signs the application without reading it, or knowing of the false answers so inserted, he is not responsible for the answers so made." Cont. Ins. Co. v. Ford, 140 Ky. 405, 131 S. W. 189.

"In the application the insured denied ever negotiating for insurance with any other company. It was shown that while the application was being written it was made known by the insured that he had applied to the 'Legion of Honor'; that the agent of the insurance company suggested that mutual benefit companies were not contemplated by the inquiry upon which the answer was given, the agent knowing of the negotiations with the 'Legion of Honor.' Held, that by these facts there was no misrepresentation to the company." Eq. Life Ins. Co. v. Hazelwood, 75 Tex. 338, 12 S. W. 621, 7 L. R. A. 217, 16 Am. St. Rep. 893.

"The court properly allowed the plaintiff to prove that the insured made a true statement to the medical examiner that he had the 'grippe' and a slight attack of pleurisy; and where there is no pretense that he had actual knowledge of the contents of the report, but was merely asked to sign the statement at the end thereof, the court properly instructed the jury that if he had had the disease of pleurisy, and answered 'No,' it would be a misrepresentation of a material fact which would avoid the policy; but that if he told the true facts to the medical examiner, and he neglected or omitted to write the answer in his report, the insured was not responsible for such omission or neglect unless he had actual knowledge that the answer had been imperfectly or incorrectly written.

"Where the insured, in good faith, makes truthful answers to the questions contained in the application or medical examination, but his answers, owing to the fraud, negligence, or mistake of the agent of the company in filling it out, are incorrectly transcribed, the company is estopped to assert their falsity as a defense to the policy." Lyon v. United Moderns, 148 Cal. 170, 83 Pac.

804, 4 L. R. A. (N. S.) 247, 113 Am. St. Rep. 291. 7 Ann. Cas. 672.

It is contended by the defendant that the policy in this case is void because it was not delivered to the insured while he was in good health, the policy itself providing that it must be so delivered. But that provision of the policy. like other of its provisions, made for the benefit of the company, could be waived, and we are of the opinion that the company itself had sufficient direct notice and knowledge that the insured was not in good health as to amount to a waiver of that provision of the policy.

On December 21, 1914, the state agent wrote the company a letter in which this language was used:

"When Mr. Whitehead signed the application for change of policy he was suffering from a closing up of the gall tubes or something of that kind. Dr. Kniseley inserted in his change of application what that was, and I forgot to have him put it in the amended application."

The supplemental application referred to in this letter contained a provision written in it by the examining physician of the defendant, as follows: "Has hepatogenous jaundice caused from falling and injuring his side. Condition is improving now."

The policy was delivered to the insured on the 26th day of December, 1914, with full knowledge on the part of the state agent of the defendant of the condition of health of the insured, and with the direct knowledge in the possession of the company itself of the condition of health of the insured contained in the letter written by its state agent on the 21st day of December, 1914, and that contained in the supplemental application, "Has hepatogenous jaundice caused from falling and injuring his side. Condition is improving now." With the knowledge in possession of the state agent of the physical condition of the insured, which we also impute as notice to and knowledge of the defendant. the knowledge coming to the agent while acting within the scope of his authority, and with the direct information as to the condition of the health of the insured as stated above in possession of the defendant, it continued to keep the policy in force and binding, and continued to retain the premium for the first year paid upon the policy, and never made any effort to return the premium or to cancel the policy. and never took any steps to do so, until after suit had been brought to enforce collection of the policy; and in its answer filed on the 18th day of May, 1915, we see for the first time any effort made or steps being taken by the de-

fendant to tender back the premium paid, and we are of the opinion, under such circumstances, the offer to return the premium comes too late.

In the case of A. B. Ins. Co. v. Thomas, 53 Okla. 11, 154 Pac. 44, in an opinion by Justice Turner, this court said:

"But where, in addition to the facts stated, the check given in payment of the premiums was collected, and the proceeds placed to the credit of defendant, pursuant to a prior arrangement with the bank, and, being thus received, has since been retained by defendant with knowledge of all the facts, held to constitute a waiver of such condition precedent, and that defendant is estopped to urge that no risk attached under the contract of insurance."

In view of the fact that the defendant prepared the supplemental application in this case, and the further fact that its state agent, while acting within the scope of his authority, became possessed of the knowledge of the condition of the health of the insured, which we hold to be imputable to the defendant, and in view of the fact that the defendant itself had direct information before the delivery of the policy as to the condition of the health of the insured, and in view of the further fact that the defendant kept and retained the premium paid until after suit had been instituted to enforce collection of this policy, the defendant will be deemed to have waived all the conditions which it claims to have operated to defeat the policy, and the court therefore committed no prejudicial error by admitting the testimony complained of, nor in overruling the demurrer to the evidence, nor in overruling the motion for a directed verdict in favor of the defendant.

The defendant makes complaint that the court erred in giving instructions 6, 10, and 12, and by failing to give instructions offered by the defendant. We have examined the instructions given by the court of which complaint is made, and we are of the opinion that instruction 10, as given by the court, is far more liberal in favor of the defendant than it should have been, and that no error prejudicial to the defendant was committed thereby; and as to the other instructions we are of the opinion that they correctly state the law applicable in this case. We are further of the opinion that the instructions offered by the defendant which were refused by the court did not correctly state the law as applicable to the facts in this case, and therefore they were properly refused.

Finding no prejudicial error, we are of the opinion that this case should be affirmed, and it is so ordered.

By the Court: It is so ordered.