## ROSEN et al. v. MARTIN.

No. 12438—Opinion Filed May 20, 1924.

(Syllabus.)

1. Good Will—Sale of Moving Picture Business—Construction of Contracts as Affecting Building.

When a sale of a moving picture show business is made and the conveyance specifies "the equipment, the piano, and everything pertaining to the picture show and the good will." this language will not effect the conveyance of a building owned by the grantor, in which the business is being conducted, in the absence of a clear intention that it shall so operate.

2. Same—Definition of Good Will.

The term "good will" means practically what the words import, and a conveyance of good will transfers to the purchaser the right to the benefit arising out of the probability that the old customers will resort to the old place. The term "good will" when used in connection with the sale of a business will not ordinarily be construed to include the title to a building in which the business is being conducted.

3. Estoppel—Requisites.

In order that the doctrine of equitable estoppel may be successfully invoked, it is necessary that the party asserting the plea shall have been misled to his prejudice.

4. Judgment Sustained.

Record examined, and judgment of the trial court found supported by sufficient evidence.

Error from District Court, Rogers County; Charles W. Mason, Judge.

Action by W. S. Rosen and another against H. M. Martin. Judgment for defendant, and plaintiff brings error. Affirmed.

Adams & Wills, for plaintiffs in error.

Robson & Bayless. for defendant in error.

GORDON, J. This action was commenced in the district court of Rogers county. Plaintiff's petition alleged that W. S. Rosen was the owner of certain real estate in the city of Claremore, Rogers county, Okla. That plaintiff Savoy Amusement Company holds the lease upon said property and is in possession thereunder, operating a picture show or theatre under the name of "Lyric Theatre"; that defendant has threatened to tear down and remove a portion of the building so used by Savoy Amusement Company, and will leave the rear end of the building open, and render it impossible for said Savoy Amusement Company to operate its business. That unless enjoined, defendant will put such threats into effect, causing irreparable

injury to plaintiffs, and that plaintiffs have no adequate remedy at law. They pray for injunction restraining defendant from entering upon the real estate, and from tearing down or removing any part thereof. To this petition defendant filed his answer and cross-petition. In his answer, defendant alleged that plaintiff W. S. Rosen is the owner of the real estate involved by purchase from the estate of J. B. Boling, deceased; that Boling, while the owner, leased to defendant the building on this real estate for a period of five years from April, 1915. That said contract of lease was in writing, and provided that the defendant should erect certain improvements or additions on the south end of the building in order to make it suitable for "theatre purposes." and provided further that at the end of the five year period, said Boling would pay the value of such improvements, or the defendant might remove the same from the premises; that this contract of lease was lost and not recorded, but that plaintiff Rosen had actual notice of the existence of the contract before his purchase. That upon the expiration of said lease defendant called on Rosen for the payment of the value of the improvements placed on said real estate by him, that said plaintiff refused to pay. and thereupon the defendant threatened to and would have removed such improvements except for the commencement of this action. That on the 27th day of March, 1915, he filed for record with the county clerk of Rogers county a statement of the substance of this contract, giving notice thereof to the public; that Savoy Amusement Company took its lease with full knowledge of this contract. and that the improvements placed on said property by the defendant are worth $3,000.

He prayed judgment for the sum of $3,000, or permission to remove his improvements. In his cross-petition defendant sets out his election to hold possession of this property for five years additional from May 1, 1920, as provided in his contract, and prays the possession in accordance with said contract.

To this answer and cross-petition the plaintiffs filed a reply denying the allegations of the answer and cross-petition. and alleging that Savoy Amusement Company purchased its lease upon the real estate in good faith and for a valuable consideration. and without notice, and alleged, further. that if the defendant had the lease contract mentioned, he sold and conveyed all of his interest in the real estate to one John Sampson. Upon these pleadings the cause went

to trial. The parties will be designated as in the trial court.

The trial court held the burden of proof to be upon the defendant. The cause was submitted to the court without the intervention of a jury. Stipulation was made that all issues made should be adjudicated. Brooks v. Tyner et al., 38 Okla. 271, 132 Pac. 683.

In the early stages of the trial, much time was devoted to the effort to prove the conditions of the original lease contract between J. M. Boling and others and the defendant, proof having been made by the defendant of the loss of this contract. It later developed that the contract was in the possession of Mrs. Boling, and the original contract was finally introduced in evidence by the plaintiff.

This contract was made on the 24th day of February, 1915, being signed on the one part by J. M. Boling, Mrs. J. M. Boling, and B. M. Davis, and on the other part by H. M. Martin. The evidence fails to show what interest Mrs. J. M. Boling or B. M. Davis had in this property, but it is conceded throughout the trial that the lease was valid, and that the subsequent transfers of the property covered by this lease were made by those deriving title from J. M. Boling. This lease provides that the defendant. Martin shall hold the building, which was then occupied by him, for a term of five years, at a stipulated rental. It provides, further, that the defendant "shall have preference in releasing it, if so desired," and the parties agree that the defendant may make such enlargements of the building as he may desire and wish in order to fit it for use as a moving picture show, the provision in this regard being as follows:

"It is further understood and agreed by and between the parties hereto that in the event said party of the second part shall make such improvements and enlargements to said premises that he shall do so at his own expense, but at the end of the term hereby granted the parties of the first part shall have the right to purchase such enlargements from the party of the second part, provided, they can agree on price, or that in the event the parties of the first part shall not so desire to purchase such enlargements and improvements, the party of the second part shall have the right to remove the same from said premises, always with the distinct understanding that in doing so, he leaves the present building in as good shape of repair as it is at the present time, that is to say, he is to replace building as it was originally and that the present build-ing shall not be damaged or made unfit for occupancy by reason of such removal."

At the time this contract was executed the defendant was operating a moving picture show in this building. Soon after its execution he enlarged the building, adding thereto an annex about 30 feet in length, and of practically the same width as the original building. For some months he continued to operate the picture show, but after the expiration of something like a year, he sold the picture show, and the good will, to John Sampson, and Sampson went into possession. Soon after this sale J. B. Boling died. and his wife became the owner of the property.

On March 16, 1918, the plaintiff Rosen made an agreement to purchase the real estate upon which the picture show was being operated. By the terms of this purchase Rosen was to pay $16,000 for the property, and did on that date issue his check in the sum of $5,000 as a guaranty of good faith. The contract was to be placed in escrow until the owner should furnish abstract of title showing good title, and when satisfactory title was shown the balance of the purchase money should be paid. On March 27, 1918, defendant Martin filed for record an instrument showing his claim against the property by reason of the construction of a building thereon. Thereafter John Sampson, who was then in possession under his agreement with the defendant, Martin, took a lease upon the property from Rosen, and thereafter transferred this lease to plaintiff Savoy Amusement Company, which was in possession under such lease when this suit was commenced on the 11th day of May, 1920.

The issues upon the trial soon narrowed themselves to the question as to whether when Martin sold the picture show business and the good will to Sampson he intended to convey his interest in the annex to the building which he had constructed, and whether Rosen and the Savoy Amusement Company had notice of the fact that the defendant. Martin, had constructed that building, and was claiming the ownership thereof. Upon these issues the court found against the plaintiffs, denying their right to an injunction, and for the defendant the value of the addition erected by him in the sum of $780. and in its judgment the court held that plaintiffs might buy within the time fixed for the said sum of $780 the improvements so made, or that upon the failure so to do, defendant should have the right to remove said addition from the property,

providing further, however, in the judgment that in the event the defendant should remove said addition, he should comply with the terms of his original contract by leaving the building in as good shape as it was when he took it, and repair any damage to the original building which might be caused by the removal of the annex; to secure the performance of which the defendant was ordered as a condition precedent to execute a good and sufficient bond in the penal sum of $1,000 payable to the plaintiffs herein. Exceptions to the judgment were taken, motion for new trial filed and overruled, and the cause is now here for review.

In accordance with the well-settled rule of this court, it becomes our duty to review the evidence, and if we find that the judgment of the trial court is clearly against the weight of the evidence, its judgment will be reversed; on the other hand, the judgment of the trial court will not be disturbed unless the same is clearly against the weight of the evidence. Huston et al., Trustees, v. Miami, 98 Okla. 35, 224 Pac. 316.

In their brief plaintiffs have set out ten assignments of error. They have not seen fit to follow rule 26 of this court, by either arguing or specifically abandoning any of these assignments of error, but have grouped their arguments under four subdivisions, which we think may be concisely stated as follows: First, by the sale made by the defendant during February, 1916, to John Sampson, defendant's lease and all rights thereunder pass to Sampson; second, the acts of the defendant in connection with the sale of the Lyric Theatre to John Sampson were such as to estop him from claiming the improvements; third, the transaction between the defendant and John Sampson in February, 1916, amounted to an assignment from the defendant to Sampson of the lease and leasehold estate, including defendants' rights to the improvements; fourth, the evidence showed that the defendant, Martin, surrendered his lease and leasehold estate, thus terminating his right to receive compensation for his improvements. We take it that plaintiffs intend to rely upon three assignments of error; First, that the judgment of the trial court is contrary to law; second, that the judgment is contrary to the evidence; third, that the judgment is not sustained by sufficient evidence, and that all other assignments of error are abandoned.

We have examined the evidence, and while there is a sharp conflict as to a number of matters involved, yet it is not difficult to deduce certain facts as clearly appearing. There can be no doubt that the defendant, Martin, in February, 1915, took the property in controversy by virtue of a lease from the owner thereof, and continued the operation of a picture show thereon. It appears to be agreed throughout the record that between the months of February, 1915, and February, 1916, the defendant erected, at his own expense, a building, or annex, which was thereafter used in the picture show business. This annex was of substantial value. The defendant estimates its value at $3,000. This annex was erected in compliance with the terms of defendant's lease contract. It became the property of the defendant, with the right of removal at the expiration of his lease, subject to the right of the lessor to pay the value thereof and retain it. Unless the defendant has been paid for said building, or has conveyed it, or by his actions put himself in such position with reference to plaintiffs in error that it would be inequitable to allow him to assert a claim therefor, he undoubtedly has the right to remove the building. It is contended that the transaction with John Sampson in the year 1916 was such as to amount to a conveyance by the defendant to Sampson of this building. Upon the matter of the transfer by the defendant to Sampson there appears to be a sharp conflict in the evidence. A bill of sale is said to have been executed by the defendant, Martin, to Sampson. The evidence of the defendant is that a bill of sale was given to Sampson. It was not produced in evidence by plaintiffs, and we find nothing in the record showing its loss, so as to justify proof of its contents. Both parties appear to have assumed that this bill of sale was lost, and there follows a mass of testimony to show the terms of the bill of sale. The parties and witnesses are in accord that the bill of sale conveyed the picture show business, the furniture and fixtures, and the good will of the business. Nothing appears to have been said in the bill of sale touching the building.

The substance of the testimony on behalf of the defendant is that Martin was willing to sell to Sampson, and did sell to Sampson, the picture show business, the good will, and all that appertained to the business, and that Sampson should occupy the building and pay the rent. That Martin specially reserved the written lease. That Martin would have sold the entire lease for a larger sum, but that for the sum paid the lease was not included, but was reserved by Martin.

The testimony on behalf of the plaintiffs

is that nothing was said about a written lease. That Sampson had no knowledge that a written lease existed, but that he understood that he was getting all that went with the picture show business. Sampson testified that he knew nothing about the ownership of a portion of the building by Martin. On page 124 C. M. we find the following:

"Q. The only thing you thought you were getting with reference to the building was the right to occupy it.

"A. Yes, sir; the same as any rented building.

"Q. You didn't claim any right to collect for the building of the annex, did you?

"A. I didn't know there was any collecting to be done."

It is peculiar that no effort was made to produce this bill of sale, or to account for its absence. On page 124 C. M. we find the following.

"Q. Where is that bill of sale you received?

"A. I think I turned it over to Mr. Kind. If I didn't, it is possible I have got it."

While no objection was made to the proof of the contents of this bill of sale, the failure to produce it or to account for it must naturally weigh heavily against those who so failed to produce it. With the record in this condition, we have to determine whether or not a bill of sale conveying the picture show business and all things appertaining to the business, and the good will of the business, is sufficient to convey to Sampson title to the building erected and owned by Martin. We think it is not. If by this bill of sale Sampson purchased the building, he purchased something of large value which he did not expect to receive, and which was not in his mind at the time the agreement was made. Plaintiffs have cited a large number of authorities defining "good will," and the extent of the term when used in conveyances of various kinds of businesses. In R. C. L. 977, we find the following:

"Good will is a modern but important growth of the law, not mentioned by some of the early writers, but given great prominence at the present time. The good will of a business or profession has often been defined by both English and American authorities. Of all such definitions the narrowest is probably that of Lord Eldon. who defined good will as 'the probability that the old customers will resort to the old place.' In subsequent decisions, however. the courts took the view that good will carried more with it than simply the advantage of keeping the premises which were occupied by a former firm, and the chance thereby had of the customers of the former firm being attracted to those premises, and expanded the definition so as to make it embrace all that good disposition which customers entertain toward the house or business identified by the particular firm, and which may induce them to continue giving their custom to it. The definition of Judge Story, frequently quoted with approval, is yet more comprehensive, and defines good will as the advantage or benefit which is acquired by an establishment beyond the mere value of the capital stock, funds or property employed therein, in consequence of the general patronage and encouragement which it receives from constant or habitual customers on account of its local position, or common celebrity, or reputation for skill, or affluence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices."

The case more strongly stressed in the brief of plaintiffs in error is the case of Kauffmann et al. v. Kauffmann et al. (Pa.) 86 Atl. 634. In that case the question was whether the value of certain leaseholds of the partnership were included in the item of good will. The partnership was conducting a department store, and to serve its purposes secured leases on several adjoining lots of ground, and erected a building thereon, in which the business had been transacted for a long time. The value of those leaseholds for their unexpired term had gradually increased, and the court held that the increased value caused by the conduct of the business should be regarded as included in the good will of the business; so in the case here, if the picture show had been successful so as to render the right of remaining in this building of great value, this right should be included in the term good will of the business, but in the case we are now considering, there is no question raised of the right of the vendee, Sampson, to occupy the building until the expiration of the lease. He occupied the premises until a new lease was granted to Rosen.

The various definitions of "good will" leaves no doubt that it is merely an intangible asset pertaining to an established business. See Words and Phrases (2d Series) vol. 2, p. 762. We are unable to conclude that by the term "good will" it was any more the intention of the parties that this building of Martin's should be transferred than it was the intention that the building of Boling should be transferred. The parties to a contract are presumed to understand the meaning of the terms used there-

in. Tidal Oil Co. v. Roelfe, 77 Okla. 183, 187 Pac. 486.

It appears that when Martin transferred this picture show business to Sampson, he was under the impression that an assignment of his lease would assign the building, and for this reason he refused to assign the lease. This theory has been followed in the argument in the case here, and it is seriously contended that the right to occupy the building amounted to an assignment of the lease, and that by operation of law the assignment of the lease transferred the building. With this contention we cannot agree. The building was constructed by virtue of permission given in the lease from Boling to Martin, but when the building was constructed it became the property of Martin, regardless of the lease, and remained his property with the right of removal, with no restrictions upon such removal except the right of Boling to pay for the same. An assignee of this lease could take the right only to use the building, but not the title thereto, unless title was specifically conveyed.

It is next contended that Martin is estopped to claim title and the right to remove this building, because in his sale to Sampson he took a mortgage upon "all of the furniture, fixtures, machine and all things appertaining to what is known as the Lyric Theatre, in the Davis-Boling Block, on Third street, Claremore, Oklahoma." If the building came within this description, it may well be said that the taking of the mortgage is an admission on the part of the mortgagee that the building had by transfer become the property of the mortgagor. The mortgage describes "all the articles of personal property described in the following schedule, to wit: (and then recites the items mortgaged as above quoted.")

In construing this instrument and determining the intention of the parties. we must look to the general transaction and the general context of the instrument, reading "all of the furniture, fixtures, machine and all things appertaining to what is known as the Lyric Theatre." This means things such as furniture, fixtures, and those articles used in the operation of the theatre, and it was not intended, as we see it, to cover a building in which the theatre was operated. It is a well-known rule of construction that the term "all things appertaining to" must be construed as such things as are included in or pertain to the classes enumerated.

In the case of Wolf et al. v. Blackwell Oil & Gas Co. et al., 77 Okla. 81, 186 Pac. 484,

the second and third paragraphs of the syllabus are as follows:

"By the rule of ejusdem generis, where general words follow the enumeration of particular classes of minerals, the general words will be construed as applicable only to minerals of the same general character or class as those enumerated.

"However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract."

See, also. Kokomo Oil Co. v. Bell, 81 Okla. 247, 198 Pac. 326; Prowant et al. v. Sealey, 77 Okla. 244, 187 Pac. 235.

In the case of Tidal Oil Co. v. Roelfs, 77 Okla. 183, 187 Pac. 486, it is said in the first paragraph of the syllabus:

"It is due the parties to contract in writing to assume that they know and understand the logical and grammatical use of words, phrases, and clauses chosen by them to convey the thought and purpose of their contract."

Martin understood that he was not transferring his building. Sampson understood that he had not acquired a building. If there were any ambiguity in the terms of the mortgage, so as to require construction, the construction placed upon it by the parties as shown by their subsequent acts and conduct will be followed by the court. Weibener v. Peoples, 44 Okla. 32, 142 Pac. 1036.

The record shows that a short time after this transaction was made, Sampson made several efforts to purchase the written lease. Martin was anxious to sell the written lease. It was contemplated by the parties that the sale of the written lease would convey the annex to the building. This sale would have been consummated except that Mrs. Boling, the owner, refused to assent to the sale.

It is further contended by the plaintiffs that the acts and conduct of the defendant. Martin, were such as to estop him from thereafter claiming the improvements in question, or the right of compensation therefor against the present holder, and it is further claimed that the present holders are holders for value without notice. In order to constitute an equitable estoppel. there must be a misrepresentation or concealment of facts which ought in good conscience to have been revealed to the party to whom a contract is being made. The party to whom such misrepresentations are made, or from whom such facts are concealed, must have been without knowledge, or the means of knowledge, of the real facts.

Such misrepresentation or intentional concealment must have been made with the intention that it should be acted upon by the other party, and to his disadvantage, and such other party must have relied upon it. Flesner v. Cooper, 62 Okla. 263, 162 Pac. 1112; Williamson-Halsell-Frasier v. King, 58 Okla. 120, 158 Pac. 1142.

The testimony is in conflict as to the facts surrounding the negotiations between Sampson and Martin for the purchase of this picture show. Martin claimed that he made it known that he held a written lease for five years upon the premises which he did not propose to sell. Sampson claimed, on the other hand, that nothing was said about the written lease; that he was to occupy the premises for the term for which Martin could occupy them, and was to pay the rent. Martin claimed that he refused to sell the lease at the price made because he believed that the sale of the written lease would convey his improvements, and he did not purpose to convey such improvements. Sampson testified that he did not know of the ownership of the improvements by Martin, did not know that by the transaction he was obtaining title to any improvements, and did not know of the existence of a written lease. We can see here no fraudulent intention on the part of Martin. We can see no intentional misrepresentation or concealment of a fact which ought in good conscience to have been revealed by Martin. No claim is made by Sampson that he would not have purchased had he known of the existence of the written lease, or had he known of the ownership, by Martin, of the improvements. Nowhere does Sampson claim that he has been defrauded. The elements of an equitable estoppel are clearly lacking here. Prior to the time Rosen purchased the real estate, and long before the expiration of Martin's lease, Sampson had made various efforts to purchase from Martin the written lease and the improvements. Martin had made various efforts to sell the lease and improvements. Brophy, who appears as the managing officer of the Savoy Amusement Company, had talked of purchasing the lease. It could have been no secret among those interested, with any knowledge of the property, that Martin claimed these improvements. When Rosen came to purchase, he was advised that there might be trouble with Martin on account of his ownership of these improvements. He made a deposit in escrow, to bind his bargain of purchase, but before his purchase was complete, Martin filed and recorded a notice of his claim. To protect himself, Rosen so made his contract of purchase that he was indemnified by Mrs. Boling against the claim of Martin.

The trial court found generally for the defendant, and this general finding must include a finding that Rosen and the Savoy Amusement Company took with notice. We are of the opinion that the testimony justifies the finding and judgment of the court. The amount fixed in the judgment to compensate Martin is evidently fixed by determining, as nearly as could be, the cost of taking down the improvements, and deducting this cost from the value of the building as removed. The owner is protected by the bond of the defendant, providing for the replacement of the rear end of the building in as good condition as when the annex was added thereto.

Substantial justice appears to have been done in the cause, and finding no error in the record, the judgment of the trial court will be affirmed, and it is so ordered.

JOHNSON, C. J., and McNEILL, NICHOLSON, HARRISON, and BRANSON, JJ., concur.