2009 OK CIV APP 8

**INERGY PROPANE, LLC, a Delaware corporation, Plaintiff/Appellee,**

v.

**David L. LUNDY, individually, and d/b/a Dave Lundy Propane, Defendant/Appellant.**

**No. 103,914.**

Court of Civil Appeals of Oklahoma, Division No. 2.

Aug. 13, 2008.

Rehearing Denied Oct. 6, 2008.

Certiorari Denied Jan. 20, 2009.

right. *Stone v. White*, 301 U.S. 532, 534–35, 57 S.Ct. 851, 852–53, 81 L.Ed. 1265 (1937).

548

Lincoln C. McElroy, Charles E. Geister III, Hartzog Conger Cason & Neville, Oklahoma City, OK, for Plaintiff/Appellee.

Randy L. Goodman, Nicoma Park, OK, for Defendant/Appellant.

JOHN F. FISCHER, Judge.

¶ 1 David L. Lundy, individually and d/b/a Dave Lundy Propane, appeals from a temporary injunction requiring Lundy to remove any propane tanks from Lincoln, Logan, Pottawatomie and Cleveland counties and to comply with the terms of a non-compete agreement and the terms of a confidentiality

and non-solicitation agreement. After reviewing the record and hearing the oral arguments of counsel, we find the evidence in the record sufficient to warrant the issuance of a preliminary injunction and affirm.

## BACKGROUND FACTS

¶ 2 Lundy started working in the propane business in 1977. On October 26, 1992, Lundy sold his propane business to Beck & Root Fuel Company (Beck & Root) pursuant to an Asset Purchase Agreement. As part of that transaction, Lundy signed a Covenant Not to Compete (Non–Compete Agreement). The Non–Compete Agreement provided that Lundy would not engage in the propane business in Lincoln, Logan, Pottawatomie and Cleveland counties for a period of 15 years. Separate consideration was agreed for the Non–Compete Agreement in the amount of $300,600, payable in 180 monthly installments of $1,670. Inergy Propane, LLC, is the successor in interest to Beck & Root. The date and terms of this acquisition are not apparent from the record.

¶ 3 After the sale of his propane business, Lundy went to work for Inergy in essentially the same geographic area previously served by the business he sold in 1992. He was employed from 1998 to 2000, and again from June 2002 to January 2005. As partial consideration for his second employment, Inergy required and Lundy signed a Confidentiality and Non–Solicitation Agreement (Non–Solicitation Agreement). That Agreement defined confidential information to include Inergy's customer information and customer lists, its pricing information, business strategies and other trade secrets. Excluded from this definition was information rightfully known to Lundy prior to his employment and information properly within the public domain. The Non–Solicitation Agreement prohibited Lundy from disclosing or using Inergy's confidential information during the term of and after termination of his employment. The Non–Solicitation Agreement also prohibited Lundy, for one year following termination of his employment, from hiring Inergy employees to work for another employer. Finally, the Non–Solicitation Agreement prohibited Lundy, for two years following termination of his employment, from soliciting or diverting the business of any Inergy customer within fifty miles of the Inergy locations to which Lundy had been assigned. A provision in the Non–Solicitation Agreement acknowledges that it is not intended to prohibit competition between Inergy and Lundy or his employment by a competing firm except as prohibited by the terms of the Agreement.

¶ 4 Lundy resigned from his second employment at Inergy in January 2005, and started a new propane business. The customers of Lundy's new business included former Inergy customers and non-Inergy customers located in the four counties mentioned in the Non–Compete Agreement.

¶ 5 Inergy filed suit on August 9, 2005, and moved for a preliminary injunction on March 29, 2006. At the hearing on its motion, Inergy introduced evidence showing that certain customers of Lundy's new business had been Inergy customers, that Lundy utilized old Inergy sales tickets with his new customers, at least some of which did not clearly disclose the identity of Lundy's new operation, and that Lundy had made disparaging remarks to some Inergy customers in an effort to obtain their business. Lundy acknowledges that former Inergy customers are customers of his new business but contends that they sought him out and that he did not solicit their business. The district court granted Inergy's motion for preliminary injunction on October 5, 2006. It is from that order that Lundy appeals.

## STANDARD OF REVIEW

¶ 6 Although the underlying issues in this appeal involve the enforcement of a contract, an action at law, *see Pitco Production Company v. Chaparral Energy, Inc.,* 2003 OK 5, ¶ 12, 63 P.3d 541, 545, the injunctive relief sought by Inergy invoked the district court's equitable jurisdiction. *Sharp v. 251st St. Landfill, Inc.,* 1996 OK 109, ¶ 4, 925 P.2d 546, 549. An injunction is an "extraordinary remedy, and relief by this means is not to be lightly granted." *Amoco Prod. Co. v. Lindley,* 1980 OK 6, ¶ 50, 609 P.2d 733, 745. Entitlement to injunctive relief must be established by clear and convincing evidence. *Sharp,* 1996 OK 109 at ¶ 5, 925 P.2d at 549.

"The standard of review imposed for the issuance of a temporary injunction is whether the district court abused its discretion or entered a decision against the evidence." *Brown v. Oklahoma Secondary Sch. Activities Ass'n*, 2005 OK 88, ¶ 11, 125 P.3d 1219, 1225 (footnote omitted). The discretion of the district court to grant an injunction must be made according to well established equitable principles. *Cloer v. Gillespie*, 1963 OK 195, ¶ 12, 386 P.2d 1015, 1018. In reviewing the decision, the appellate court will consider and weigh the evidence presented to the district court. *Board of Regents v. NCAA*, 1977 OK 17, ¶ 3, 561 P.2d 499, 502.

## DISCUSSION

¶ 7 Lundy raises four arguments in this appeal. He challenges Inergy's authority to enforce the Non–Compete Agreement arguing it required his consent, which he did not give, before it could be assigned. He argues that the Non–Solicitation Agreement superceded the Non–Compete Agreement and that the later agreement specifically permits competition. He contends that the Non–Compete and Non–Solicitation Agreements are unenforceable as unlawful restraints on trade. He also argues that the extraordinary remedy of a temporary injunction is inappropriate in this case.[1]

### I. Inergy May Enforce the Non–Compete Agreement

¶ 8 Lundy correctly points out that the Non–Compete Agreement is not "assignable by Obligors without the prior written consent of Lundys." Beck & Root and Phillip D. Root, individually, are the parties identified in the Non–Compete Agreement as the Obligors. Although Lundy did consent, in writing, when the company was acquired by Inergy's predecessor, he did not sign any consent when Inergy acquired his former business. He argues, therefore, that Inergy cannot enforce the Non–Compete Agreement. Several problems defeat this argument.

¶ 9 First, it is undisputed that Inergy is the successor to Beck & Root. As a general rule, a successor corporation may enforce the contractual rights of its predecessor. *Cf., Farren v. Autoviable Servs., Inc.*, 1973 OK 4, 508 P.2d 646 (surviving corporation after merger could enforce non-compete agreement between the acquired corporation and its former president).

¶ 10 Second, the language of the Non–Compete Agreement contemplates successors to the interest held by Beck & Root, providing that it is binding on the parties "and their respective successors and assigns." The Non–Compete Agreement also provides that the covenants and agreements "shall be solely for the benefit of, and shall be enforceable only by, the parties hereto of [sic] their respective successors and assigns." Nonetheless, Lundy argues that he has a right to approve any successor to Beck & Root and relies on the following language: "This Agreement and any rights hereunder shall not be *assignable* by Obligors without the prior written consent of Lundys or their successors and assigns." (Emphasis added.) Obviously absent from this sentence is any reference to Beck & Root's "successors." The only restriction is on assignment of the contract right at issue.

¶ 11 An assignment is the transfer of a contractual right, which extinguishes the assignor's interest and creates that interest in the assignee. Restatement (Second) of Contracts § 317 (1981). Although Phillip D. Root transferred his interest in the Non–Compete Agreement when the business was acquired by Inergy's predecessor, Lundy consented to that assignment. The record does not reflect how Inergy's predecessor acquired Beck & Root's interest. If it acquired that interest by purchase of the company's stock, no assignment occurred. *See Cooke v. Tankersley*, 1948 OK 23, ¶ 27, 189 P.2d 417, 419 (title to corporate assets is held by the corporation, not individual stockholders). Shares of stock in a corporation are personal property and transferable. 18 O.S. 2001 § 1040. The Non–Compete Agreement

---

1. Although it appears that Lundy employed individuals who were Inergy employees, he does not appeal that portion of the District court's order enforcing the non-employment portion of the Non–Solicitation Agreement.

prohibits assignment without consent. It does not, however, prohibit the sale of stock or transfer of controlling interest in the corporation, which owns the contractual right Inergy seeks to enforce in this action.

¶ 12 The language of a contract is to govern its interpretation. 15 O.S.2001 § 154. The language of this contract does not require Lundy's consent prior to the sale of Beck & Root stock, even controlling interest in that company.

¶ 13 Third, even if there were some uncertainty regarding what the parties intended by this provision, if "the meaning of the terms used in a written contract is not clear, the subsequent acts of the parties showing the construction they have put upon it themselves are to be looked to by the court." *Homa–Okla Oil Co. v. Parsons*, 1925 OK 868, ¶ 0, 240 P. 1063 (Syllabus 1). After Inergy acquired Lundy's former business, it continued to make the payments due pursuant to the Non–Compete Agreement. Lundy accepted those payments, knowing they were made by Inergy and that Inergy was the successor to Beck & Root. Lundy's conduct evidences his construction of the Non–Compete Agreement to permit the acquisition by Inergy without his consent. *See* 15 O.S.2001 § 75 (providing that voluntary acceptance of the benefits of a transaction is equivalent to a consent to all known obligations from the transaction).

¶ 14 Fourth, Lundy has waived this argument.

Waiver is the surrender or relinquishment of an existing right. Waiver may be effected voluntarily by an affirmative act by one having authority indicating an intention to waive and need not necessarily be preceded by notice; or waiver may be effected by the omission or failure of a party to assert in his behalf an existing right, which must be preceded by notice. The law enjoins upon all men the necessity to talk when they should talk, or they will not be heard to talk when they want to talk....

*Federal Life Ins. Co. v. Whitehead,* 1918 OK 324, ¶ 29, 174 P. 784, 790. Lundy knowingly accepted from Inergy the payments due pursuant to the Non–Compete Agreement without objection. Further, until this suit was filed, Lundy did not assert any right he may have had to prevent the acquisition of his former business by Inergy in the absence of his consent. The law clearly imposed a duty on Lundy to raise this issue prior to the institution of this litigation. It is too late to do so now.

## II. The Non–Solicitation Agreement Does Not Supercede the Non–Compete Agreement.

¶ 15 To establish his right to compete with Inergy, Lundy first points to the Non–Solicitation Agreement. Lundy is correct that the Non–Solicitation Agreement does "not prohibit [him] from competing with [Inergy] as long as he ... honors all of the terms of this Agreement." Further, it does not prevent him "from working for another propane company so long as he ... adheres to the terms of this Agreement." However, even a plain reading of that language cannot be construed to authorize all competition. 15 O.S.2001 § 160, ("words of a contract are to be understood in their ordinary and popular sense"); *Lewis v. Sac and Fox Tribe of Oklahoma Housing Auth.,* 1994 OK 20, 896 P.2d 503 (language in a contract to be given its plain and ordinary meaning). Inergy has agreed that Lundy may compete but only as specified in the terms of the Non–Solicitation Agreement.

First, the Agreement specifically prohibits competition with respect to:

the business of any person or entity located within fifty (50) miles of any of the Company's locations at which the Employee worked ... who was a customer of the Company at any time during the twelve (12) month period prior to Employee's last day of employment, or who was solicited by or received a proposal from the Company during the six (6) month period prior to Employee's last day of employment.

Lundy cannot "solicit or divert, or attempt to solicit or divert" those customers for a period of two years following termination of his employment. There was evidence before the district court that Lundy breached this portion of the Non–Solicitation Agreement.

¶ 16 Second, although the Non–Solicitation Agreement "constitutes the entire agreement between [Lundy] and the Company," it does so only as to "the Confidential Information, the Employee's non-solicitation obligations, and the Employee's post-termination obligations related to the matters set forth in this Agreement." The Non–Solicitation Agreement does, as Lundy contends, supercede any prior agreement, but only as to any agreement "regarding the matters set forth in this Agreement." The Non–Solicitation Agreement is contained in a contract defining the terms of Lundy's employment by Inergy; the Non–Compete Agreement concerned a sale of Lundy's business ten years before that employment relationship was created. Two contracts relating to the same matters, between the same parties and made as part of the same transaction are to be taken as one. 15 O.S.2001 § 158. However, the Non–Solicitation Agreement and the Non–Compete Agreement concern different matters and were not made as part of the same transaction.

¶ 17 Consequently, there is no construction of these agreements by which Lundy would be free to compete in the four counties covered by the Non–Compete Agreement, nor free to solicit the business of the Inergy customers identified in the Non–Solicitation Agreement.

### III. Competitive Analysis of the Agreements

¶ 18 Having established that the Non–Compete and Non–Solicitation Agreements are separate agreements with different purposes compels our separate analysis of their enforceability to address Lundy's arguments that these agreements unlawfully restrain trade.

### A. The Non–Compete Agreement

■ ¶ 19 Lundy's specific objection to the Non–Compete Agreement is to its term. He argues that Oklahoma has never enforced a non-compete agreement having a fifteen-year term and that preventing Lundy from competing in the four counties identified in that Agreement for fifteen years is unreasonable. He relies on 15 O.S.2001 § 217:

Every contract by which any one is restrained from exercising a lawful profession, trade or business of any kind, otherwise than as provided by Sections 218 and 219 of this title, or otherwise than as provided by Section 2 of this act, is to that extent void.

He does not, however, provide an argument that would exclude the Non–Compete Agreement from the exception to section 217 found in 15 O.S.2001 § 218:

One who sells the goodwill of a business may agree with the buyer to refrain from carrying on a similar business within a specified county and any county or counties contiguous thereto ... so long as the buyer, or any person deriving title to the goodwill from him carries on a like business therein.

■ ¶ 20 It is not disputed that the four counties identified in the Non–Compete Agreement are "contiguous" within the meaning of the statute. Nor can it be argued that the sale of goodwill is not the purpose of the Non–Compete Agreement. That Agreement refers to an Asset Purchase Agreement between the Lundys and Beck & Root and provides that the covenant precluding competition is "necessary to protect the business and interest that the Obligors are acquiring." The obvious intention of one who sells a business and agrees not to compete with the buyer is to sell the good will of that business. *See Wall v. Chapman*, 1921 OK 367, 202 P. 303. Good will is "the custom or patronage of any established trade or business [including] the value that results from the probability that old customers will continue to trade with an established concern." *Freeling v. Wood*, 1961 OK 113, ¶ 12, 361 P.2d 1061, 1063. Good will "carrie[s] more with it than simply the advantage of keeping the premises which were occupied by a former firm [and included] common celebrity, or reputation for skill, or affluence or punctuality." *Rosen v. Martin*, 1924 OK 570, ¶ 16, 226 P. 577, 581. *See also Griffin v. Hunt*, 1954 OK 87, 268 P.2d 874. "The goodwill of a business is the expectation of continued public patronage." 60 O.S.2001 § 315.

¶ 21 In 1992, Lundy sold that expectation of continued public patronage for $300,600. He agreed that he would not interfere with the "probability" that his old customers would continue to trade with his business even though owned by Beck & Root. And, he agreed to do so for fifteen years. The only time limit imposed by section 218 is that the non-compete agreement may not extend beyond the time the buyer or the buyer's successors "carry on a like business." That time period may be more or less than fifteen years. In this case, however, it is not disputed that when the fifteen-year term of the Non–Compete Agreement expired in 2007, Inergy was carrying on the business purchased from Lundy. Subject to the terms of the Non–Solicitation Agreement, Lundy was free to compete in the four designated counties after the Non–Compete Agreement expired. Prior to that time, he was not. The Non–Compete Agreement is enforceable pursuant to the exception to section 217 created by section 218.

### B. The Non–Solicitation Agreement

¶ 22 The Non–Solicitation Agreement, like the Non–Compete Agreement, must survive the prohibitions of 12 O.S.2001 § 217 to be enforceable.[2] The statutory exceptions in section 218, exempting agreements involving the sale of goodwill of a business, and section 219, relating to agreements which dissolve a partnership, are not relevant to the Non–Solicitation Agreement. However, section 219A, enacted in 2001, creates a third exception to the contracts prohibited by section 217:

A. A person who makes an agreement with an employer, whether in writing or verbally, not to compete with the employer after the employment relationship has been terminated, shall be permitted to engage in the same business as that conducted by the former employer or in a similar business as that conducted by the former employer as long as the former employee does not directly solicit the sale of goods, services or a combination of goods and services from the established customers of the former employer.

B. Any provision in a contract between an employer and an employee in conflict with the provisions of this section shall be void and unenforceable.

This case presents the first opportunity for interpretation of section 219A.

¶ 23 The Non–Solicitation Agreement in this case applies to any person or entity: (1) located within 50 miles of the office to which Lundy was assigned, (2) that was an Inergy customer within the twelve months prior to the termination of Lundy's employment, (3) or received a proposal within six months prior to the termination of his employment. The Agreement prohibits Lundy from soliciting or diverting and attempting to solicit or divert those customers, former customers and potential customers in competition with Inergy for a period of two years after termination of his employment. In contrast to the Non–Compete Agreement, the Non–Solicitation Agreement is an agreement between an employer and employee. Although the Non–Compete Agreement prevents Lundy from competing in four counties, outside of those counties, the Non–Solicitation Agreement permits Lundy to compete with Inergy as long as he does not solicit the specified customers. We find that section 219A applies to the Non–Solicitation Agreement. Consequently, we look to that statute to determine the Non–Solicitation Agreement's enforceability.

### 1. The Section 219A Exception

¶ 24 Although the statute has only recently been enacted, the subject matter of section 219A has been the focus of significant litigation with the first reported case being decided in 1948. *See E.S. Miller Labs., Inc. v. Griffin,* 1948 OK 149, 194 P.2d 877 (invalidating a provision in a pharmaceutical salesman's employment contract that prevented him from going to work for any other pharmaceutical company in the same territory for a period of two years). The first case to enforce a post-employment non-compete

---

**2.** *Cf., E.S. Miller Labs., Inc. v. Griffin,* 1948 OK 149, 194 P.2d 877 (observing that the first Oklahoma Legislature did not adopt the common law exception to the rule prohibiting trade restraints which permitted an employee to agree not to compete after termination of his employment).

agreement was decided in 1970. In *Tatum v. Colonial Life & Accident Ins. Co. of Am.*, 1970 OK 27, 465 P.2d 448, the Supreme Court held that an agreement not to solicit existing customers of the former employer with respect to the lines of insurance sold by the former employee was not prohibited by section 217. Although the *"Tatum* Rule" has been consistently followed, *Cardiovascular Surgical Specialists, Corp. v. Mammana*, 2002 OK 27, 61 P.3d 210; *Bayly, Martin & Fay, Inc. v. Pickard*, 1989 OK 122, 780 P.2d 1168; *Thayne A. Hedges Reg'l Speech & Hearing Ctr., Inc. v. Baughman*, 1998 OK CIV APP 122, 996 P.2d 939; *Key Temp. Personnel, Inc. v. Cox*, 1994 OK CIV APP 123, 884 P.2d 1213, section 219A brings legislative permanency to this issue.

¶ 25 Prior to the enactment of section 219A, the enforceability of a customer non-solicitation agreement was determined pursuant to a rule of reason analysis. *See Bayly*, 1989 OK 122 at ¶ 11, 780 P.2d at 1171 (footnotes omitted) ("Although the rule of reason which requires that in order to be valid, a covenant must be deemed reasonable by the court, had been incorporated as a matter of law into agreements falling within the parameters of 79 O.S.1981 § 1, its application to § 217 was questionable before the [*Crown Paint v. Bankston*, 1981 OK 104, 640 P.2d 948] and [*Bd. of Regents v. Nat'l Collegiate Athletic Ass'n*, 1977 OK 17, 561 P.2d 499] decisions."). A rule of reason analysis asks three questions: (1) what is the relevant market;[3] (2) what is the effect of the restraint on competition in that market;[4] and (3) if the effect is anticompetitive, are there any procompetitive benefits that outweigh the anticompetitive effects.[5]

¶ 26 Section 219A addresses the third of these questions, whether the procompetitive effects of a non-solicitation agreement limited to established customers of the former employer outweigh the inherent anticompetitive effects of that agreement. To conclude that the statute supplants the entire rule of reason analysis, however, would lead to unintended results. For example, the statute does not address the length of time such agreements would be enforceable. That could be interpreted to sanction a permanent ban on solicitation because subparagraph B of the statute invalidates any provision in conflict with subparagraph A of the statute. We do not find that, by omitting any statutory reference to time in subparagraph A, the Legislature intended to sanction a permanent ban on soliciting the employer's customers, regardless of whether the employer remains in business. That result would, for example, be inconsistent with the exception established in section 218 (providing that non-compete agreements in conjunction with the sale of the good will of a business are only enforceable "so long as the buyer, or any person deriving title to the good will from him, carries on a like business").

¶ 27 Likewise, the statute does not address the geographic area in which a non-solicitation agreement is enforced. Nonetheless, that omission is not necessarily evidence of legislative intent to sanction a non-solicitation agreement that applies regardless of where customers of the former employee are located, or how tangential, if any, the relationship between the employee and the customer. There is substantial case law that would resolve these issues.[6] We do not find that the Legislature intended to reject this tradition by adopting section 219A, merely because the

---

3. See, for example, the analysis conducted by the Oklahoma Supreme Court in *Teleco, Inc. v. Ford Indus., Inc.*, 1978 OK 159, 587 P.2d 1360, and the federal antitrust cases cited in footnote 11 therein. Federal antitrust cases provide "valuable assistance" in interpreting Oklahoma's antitrust laws. *Bd. of Regents of Univ. of Oklahoma v. Nat'l Collegiate Athletic Ass'n*, 1977 OK 17, n. 13, 561 P.2d 499, 505 n. 13.

4. *Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). This often requires analysis of market power and market concentration. *California Dental Ass'n v.*

*Fed. Trade Comm'n*, 526 U.S. 756, 788, 119 S.Ct. 1604, 1621, 143 L.Ed.2d 935 (1999) (Breyer, J., dissenting).

5. *Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 18–23, 99 S.Ct. 1551, 1561–64, 60 L.Ed.2d 1 (1979).

6. *See Mammana*, 2002 OK 27, 61 P.3d 210; *Pickard*, 1989 OK 122, 780 P.2d 1168; *Griffin*, 1948 OK 149, 194 P.2d 877; *Baughman*, 1998 OK CIV APP 122, 996 P.2d 939; *Cox*, 1994 OK CIV APP 123, 884 P.2d 1213.

statutory language does not specifically address the geographic area in which the agreement may be enforced.

¶ 28 Clearly, section 219A is intended to create a third statutory exception to the general prohibition against contracts in restraint of trade set forth in section 217. That does not, however, require abandonment of the rule of reason analysis required by previously established case law. Section 219A was not enacted in a vacuum. Nor does the language of the statute evidence any legislative intent to supplant the existing and extensive case law interpreting section 217. Those cases and the analytical approach developed therein provide the context within which to resolve the issues not specifically addressed by the language of section 219A. What the statute does eliminate is the need for part of the rule of reason analysis. In section 219A the Legislature has determined that the pro-competitive benefits of an agreement between an employer and an employee preventing the employee from "directly solicit[ing] the sale of goods, services or a combination of goods and services from the established customers of the former employer" after termination of the employment outweigh the anti-competitive effects of that agreement. Beyond that, the Legislature left the parties free to negotiate the terms of post-employment restraints within the constraints of established legal principles.

### C. Lundy's Position

¶ 29 Lundy asserts essentially three challenges to the enforceability of the Non–Solicitation Agreement: (1) prohibiting solicitation and acceptance of referrals of customers creates a monopoly and is contrary to the holding in *Mammana;* (2) the Non–Solicitation Agreement is broader than necessary to protect against unfair competition, imposes an undue hardship and is injurious to the public contrary to the Restatement (Second) of Contracts § 188 (1981), and the holding in *Loewen Group Acquisition Corp. v. Matthews,* 2000 OK CIV APP 109, 12 P.3d 977; and (3) the Non–Solicitation Agreement is not saved by 15 O.S. Supp.2004 § 219A, and even if that statute applies, there is ample evidence from which to conclude that Lundy did not directly solicit Inergy customers. We have previously determined that section 219A applies to the Non–Solicitation Agreement. Further, the existence of evidence supporting Lundy's contention that he did not solicit Inergy customers is not the issue. There is evidence to support the district court's conclusion that Lundy did solicit at least some of Inergy's customers. That evidence is sufficient to show that the district court did not abuse its discretion in enjoining Lundy's conduct if the Non–Solicitation Agreement is enforceable. Consequently, we turn to Lundy's remaining arguments.

### 1. The Monopoly Argument

¶ 30 Lundy argues that enforcement of the Non–Solicitation Agreement will create a monopoly and is, therefore, contrary to the holding in *Mammana.* The portion of that opinion relevant to the monopoly issue analyzed the effect of a provision prohibiting a surgical specialist from accepting referrals of patients from primary care doctors. The relevant market analysis in that case disclosed that surgical specialists generally do not have a long-term relationship with those who eventually become their patients. A specialist's patients are, in essence, the patients of other doctors and are referred to the specialist for surgery. Consequently, Dr. Mammana was dependent on referrals from other doctors for his surgical patients. The Court found that prohibiting him from accepting those referrals from doctors who were not parties to the contract at issue would effectively eliminate him as a competitor in the relevant surgical market. Monopsony, controlling the sources of supply, is equally injurious to competition as a monopoly, controlling the market in which goods or services are provided. *See Been v. O.K. Indus., Inc.,* 495 F.3d 1217, 1231–32 (10th Cir.2007). Understandably, therefore, the *Mammana* Court refused to enforce the referral prohibition. Nonetheless, and more applicable to this case, the Court did find that Dr. Mammana's agreement not to actively solicit his former employer's patients for one year following termination of his employment was enforceable. The facts in this record show that the Non–Solicitation

Agreement is like the latter rather than the former Mammana agreement.[7]

## 2. The Restatement Argument

¶ 31 Lundy next argues that, after he left Inergy, he only used his pre-employment knowledge of customers to compete with Inergy, which he is permitted by law to do. Consequently, he contends, the injunction protects Inergy from fair competition. He relies on the Restatement (Second) of Contracts § 188 (1981) and *Loewen* to support this argument. Generally, section 188 provides that a restrictive covenant is reasonable if it (1) is no greater than necessary to protect the employer from unfair competition, (2) does not impose an undue hardship on the employee, and (3) is not injurious to the public. The Restatement consideration of the fairness of the restraint from the employee's perspective is derived from later common law cases.[8] This focus not only minimizes the rule of reason's concern with the effect of the restraint on competition, not competitors, but also "the common law rules

which analyzed covenants not to compete based on their reasonableness did not survive the enactment of §§ 217–219." *Bayly*, 1989 OK 122, at ¶ 10, 780 P.2d at 1171. The "fairness" of particular competitive acts is the specific focus of other statutes;[9] the "true test of legality" pursuant to a rule of reason analysis is whether the restraint "merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Board of Trade of City of Chicago v. U.S.*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).[10]

¶ 32 The Restatement analysis may provide information that is relevant to determining the "reasonableness" of a restrictive covenant, but that approach can also be incomplete or introduce considerations irrelevant to the competitive analysis required pursuant to the rule of reason, particularly with respect to the effect of the covenant on competition in the relevant market. Restatement injury to the public is "measured against the urgency of the employer's claim

7. Further, there is nothing in the record before this district court to show the market power of Inergy in the relevant geographic area nor the number of Inergy competitors within that market. However, at oral argument, the parties agreed that even without Lundy, Inergy faced significant competition from other propane retailers. The record on appeal may be supplemented by the admissions of the parties. *State ex rel. Macy v. Bd. of County Comm'rs*, 1999 OK 53, n. 8, 986 P.2d 1130, 1134 n. 8. Therefore, we need not consider Lundy's monopoly argument in the context of an employer with market power attempting to enforce an "established customer" non-solicitation agreement against a departing employee who is the only potential competitor in the relevant market. Whether that argument is available after the enactment of section 219A is also a question that we are not required to decide.

8. *See Mason v. Provident Clothing & Supply Co.*, [1913] A.C. 724, and *Herbert Morris, Ltd. v. Saxelby*, [1916] A.C. 688, establishing as a third factor to determine the reasonableness of a post-employment restraint, whether the covenant is unduly burdensome on the employee, as discussed in Harlan M. Blake, *Employee Agreements Not to Compete*, 73 Harv. L.Rev. 625, 642–43 (1960). Prior to these cases, the reasonableness of the restraint was determined by whether it was broader than necessary to protect the legitimate interest of the employer and not otherwise injurious to the public. *See Nordenfeldt v. Maxim–*

*Nordenfeldt Guns & Ammunition Co.*, [1894] A.C. 535.

9. *See, e.g.,* the discussion in *Tatum*, 1970 OK 27 at ¶¶ 7–8, 465 P.2d 448, 451, of fair and unfair forms of competition in the context of a rule of reason analysis. The *Tatum* Court declined to follow California cases that appear to have decided the "reasonableness" of the restraint based on the existence of unfair trade practices such as theft of trade secrets or disparagement of a competitor or its products. *Id.* at ¶¶ 10–11, 465 P.2d at 452. These practices are specifically precluded by other statutes in Oklahoma and do not depend on the existence of any contract subject to review pursuant to section 217. *Id.* at ¶ 12, 448 P.2d. at 452. *See also* Unfair Trade Practices Act, 79 O.S.2001 81; *Brenner v. Stavinsky*, 1939 OK 131, 88 P.2d 613 (enjoining a former employee, in the absence of any restrictive covenant, from using the former employer's customer list to compete after the employment terminated).

10. *Cf., J.W. Ripy & Son v. Art Wall Paper Mills*, 1913 OK 694, ¶ 0, 136 P. 1080, (Syllabus 2), ("A contract between individuals, the main purpose and effect of which is to promote, advance, and increase the business of those making it, will not be held to be in restraint of trade and commerce merely because its operations might possibly, in some slight or theoretical way, incidentally and indirectly restrict such trade and commerce.").

for protection," rather than an extrinsic standard, and the hardship to the employee factor permits "consideration of personal circumstances of the restrained employee-his financial circumstances or other factors unrelated to the employment relationship." Harlan M. Blake, *Employee Agreements Not to Compete,* 73 Harv. L.Rev. 625, 649–51 (1960). A rule of reason analysis focuses on the effect of the restraint on the public. The "the antitrust laws were passed 'for the protection of competition, not competitors.'" *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 224, 113 S.Ct. 2578, 2589, 125 L.Ed.2d 168 (1993) (quoting *Brown Shoe Co. v. U.S.,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)). "The fundamental test of the reasonableness of a restraint is its effect on the public." *Board of Regents,* 1977 OK 17 at ¶ 15, 561 P.2d at 506. Section 217 "was adopted for the protection of individuals engaged in lawful professions, trades and business, and for the protection of the public." *Neil v. Pennsylvania Life Ins. Co.,* 1970 OK 172, ¶ 8, 474 P.2d 961, 963.

 ¶ 33 Consequently, to the extent that Lundy argues the "reasonableness" of the Non–Solicitation Agreement is determined by the Restatement test, that argument fails as a matter of law. The Agreement is tested by the rule of reason. *Bayly,* 1989 OK 122 at ¶ 11, 780 P.2d at 1171. And, within that analysis, 15 O.S.2001 § 219A establishes that the pro-competitive effects of an agreement by a departing employee not to solicit the established customers of the employer outweigh the anti-competitive effects of that agreement.[11]

¶ 34 Second, Lundy's argument that he cannot be prohibited from using his general knowledge and skill and that argument's reliance on *Loewen* is misplaced.[12] As a condition of his second employment by Inergy, Lundy voluntarily signed the Non–Solicitation Agreement. That Agreement does not prevent Lundy from using his general knowledge of the propane business, whether that knowledge was acquired before or after he began his second term of employment with Inergy. The Agreement does not prohibit Lundy from using his general knowledge of the propane market and, therefore, who potential customers might be, with one exception. Within the general market of propane users, the Agreement prohibits Lundy from soliciting Inergy's customers whether he knew their identity before signing the Agreement or learned that information during his employment.

> It is usually held that an employee's knowledge of his employer's customers, acquired by him as an ordinary employee and not by virtue of any peculiar trust or confidence placed in him, is not a trade secret, and **in the absence of an express prohibitory agreement,** the employee may on a change of employment solicit such customers as long as he proceeds from his memory rather than by the unauthorized use of a list of customers. *Suburban Gas of Grand Junction, Inc. v. Bockelman,* 157 Colo. 78, 401 P.2d 268 (1965). Some cases hold that the distinction between taking written lists and memorized information is immaterial. We believe it is the more sound approach. (Emphasis added.)

*Central Plastics Co. v. Goodson,* 1975 OK 71, ¶ 21, 537 P.2d 330, 334. Here, we deal with an "express prohibitory agreement."

¶ 35 Because Inergy's customer list is not protectable as a trade secret, it is questionable whether Inergy would have hired Lundy and provided him access to its customers and the opportunity to develop relationships with those customers absent Lundy's agreement not to solicit those customers for the two years following termination of his employment. Such a result would be contrary to the public policy that encourages employers to hire the "ablest assistants" in exchange for protecting the employer's customers from

---

11. The parties in this case have not disputed the relevant market.

12. *Loewen* vacated a temporary injunction, which had enforced a restrictive covenant between a funeral home owner and one of its former managers. The covenant prevented the "ownership, management, operation or control" of any business related to the funeral industry. The *Loewen* Court found this agreement prevented the former manager from practicing his profession as distinguished from the "hands-off" agreement approved in *Tatum.*

competition for a reasonable time after the assistant has departed.[13] Enforcement of the Non–Solicitation Agreement merely requires Lundy to adhere to a contract term he did not find objectionable when he accepted Inergy's offer of employment and which does not otherwise prevent him from competing in the propane business.

### D. The Scope of the Injunction

¶ 36 Turning to the specific provisions of the Inergy/Lundy Agreement, the two-year ban on post-employment solicitation is enforceable. The restrictive covenant upheld in *Tatum* applied for two years after termination of employment. And, although no longer restriction has been enforced, there is nothing in this record to show that a two-year limitation is unreasonable in this case.

¶ 37 The prohibition on soliciting and diverting is more problematic. To the extent this means the "active solicitation" section 219A prescribes, it is enforceable. However, to the extent diversion of business could be interpreted to mean accepting unsolicited business, it is not enforceable. *Bayly*, 1989 OK 122 at ¶ 18, 780 P.2d at 1175 ("Where no active solicitation has occurred, restraint on an insurance agent's dealings with former clients is unenforceable.").

¶ 38 Also problematic is the Non–Solicitation Agreement's definition of Inergy's customers: "any person or entity . . . who was a customer of the Company at any time during the twelve (12) month period prior to Employee's last day of employment, or who was solicited by or received a proposal from the Company during the last six (6) month period prior to Employee's last day of employment with the Company." Section 219A(A) authorizes only non-solicitation agreements regarding the employer's "established customers." Although there may be circumstances peculiar to other markets that would dictate a different result, it is doubtful that a person who had not bought propane from Inergy for eleven months would be considered an established customer within the meaning of the statute. Less doubtful is the statute's application to potential customers, including those who had received a business proposal. The confidential nature of such proposals, including the identity of the customer and specific terms and pricing included in the proposal may be protectable for various other reasons, but section 219A is not one of them.

¶ 39 However, the only evidence presented by Inergy appears to concern those who were Inergy customers when Lundy's employment was terminated and who then switched to Lundy's new business. As previously discussed, Lundy's argument that the injunction improperly prevents him from using his prior knowledge of the identity of Inergy customers is unpersuasive, and Inergy is likely to prevail in its efforts to keep Lundy from soliciting those customers for the term of the Agreement.

¶ 40 Finally, the Non–Solicitation Agreement is limited to an area within a fifty-mile radius of Lundy's assigned place of work. As noted, section 219A contains no specific geographic limitation. Rather, and consistent with the approach adopted by the Court in *Tatum*, section 219A is not concerned with any particular geographic area. The concern of the statute is with established customers of the employer, not with where those customers may be located.[14] The Non–Solicitation Agreement specifically permits Lundy to compete with Inergy and even to solicit es-

---

**13.** *See United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 281 (6th Cir.1898), *aff'd*, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136, (1899) (discussing the transition in the English Court's treatment of post-employment restraints and the exceptions developed by the end of the nineteenth century, one of which permitted non-solicitation agreements between employers and employees because "it was of importance that business men and professional men should have every motive to employ the ablest assistants, and to instruct them thoroughly; but they would naturally be reluctant to do so unless such assistants were able to bind themselves not to set up a rival business in the vicinity after learning the details and secrets of the business of their employers").

**14.** We are not here presented with and, therefore, do not decide the application of section 219A to established customers with whom the former employee had no contact or relationship and about whom the employee had no proprietary knowledge gained through his employment. From this record, it appears that Lundy had the kind of relationship with Inergy's customers that the statute seeks to protect.

tablished Inergy customers outside the fifty-mile area. The Non–Solicitation Agreement's fifty-mile radius imposes a limitation not required by section 219A. However, and, for the reasons previously discussed, this self-imposed limitation cannot be interpreted to conflict with the provisions of section 219A(A) and, therefore, is not prohibited by section 219A(B).

### IV. Irreparable Harm

 ¶ 41 Lundy's final argument is that injunctive relief is inappropriate in this case. A temporary injunction is warranted:

> When it appears, by the petition, that the plaintiff is entitled to the relief demanded, and such relief, or any part thereof, consists in restraining the commission or continuance of some act, the commission or continuance of which, during the litigation, would produce injury to the plaintiff; or when, during the litigation, it appears that the defendant is doing, or threatens, or is about to do or is procuring or suffering to be done, some act in violation of the plaintiff's rights respecting the subject of the action, and tending to render the judgment ineffectual.

12 O.S.2001 § 1382. As interpreted by the Supreme Court, this statute requires that the movant "show a reasonable probability of final success on the merits and that if the injunction is not granted a reasonable probability [the movant] will suffer irreparable harm," that the equities balance in the movant's favor, *i.e.*, that the threatened injury outweighs whatever damage the proposed injunction may cause the non-movant, and, that the injunction would not be adverse to the public interest. *Sharp v. 251st St. Landfill, Inc.*, 1991 OK 41 at ¶ 22, 810 P.2d at 1277 (*overruled on other grounds, DuLaney v. Oklahoma State Dep't of Health*, 1993 OK 113, 868 P.2d 676).

 ¶ 42 As previously discussed, it is likely that Inergy will prevail on its claim to enforce the Non–Compete and Non–Solicitation Agreements. Consequently, we consider whether there is a reasonable possibility that the damages caused by Lundy's breach of those Agreements can be calculated or whether the harm caused is "irreparable." [15] "[I]njury or detriment is irreparable when it is incapable of being fully compensated for in damages or where the measure of damages is so speculative that it would be difficult if not impossible to correctly arrive at the amount of the damages." *Hines v. Indep. Sch. Dist. No. 50, Grant County*, 1963 OK 85, ¶ 14, 380 P.2d 943, 945 (citing *Baker v. Lloyd*, 1947 OK 12, 179 P.2d 913). Additional guidance regarding the propriety of injunctive relief is found in the Restatement (Second) of Contracts § 360 (1981). Injunctive relief may be warranted where: (1) proving damages with certainty is difficult, (2) procuring substitute performance would be difficult, and (3) the ability to collect any judgment is questionable.[16]

¶ 43 Although the profit associated with the business Lundy improperly acquired and Inergy therefore lost is capable of calculation, that amount would not fully compensate for the breach of these Agreements. First, as Inergy pointed out at oral argument, it can determine which of its customers did business with Lundy after his employment was terminated but not those who might have left Inergy for a competitor as a result of Lundy's alleged misuse of Inergy sales tickets and disparagement. Second, lost profit is not necessarily a reasonable substitute for the business Inergy lost. For example, lost profits would not account for the effect of diminished cash flow previously used to sustain payroll obligations.

¶ 44 Further, injunctive relief has traditionally been granted in this context. *See*

**15.** Lundy's only challenge to that part of the injunction enforcing the Non-compete Agreement is that fifteen years is too long a time period, an issue of which we have previously disposed. Nonetheless, injunctive relief is traditionally available to enforce non-compete agreements made in conjunction with the sale of good will. *See Griffin v. Hunt*, 1954 OK 87, 268 P.2d 874; *Threlkeld v. Steward*, 1909 OK 203, 103 P. 630.

**16.** *Cf., Threlkeld*, 1909 OK 203, at ¶ 3, 103 P. at 630, "An agreement by a physician for a valuable consideration not to practice medicine and surgery at a designated place within a reasonable distance is valid, and a breach of such agreement will be restrained by injunction, either to prevent a multiplicity of suits, or where the party is insolvent."

*Wall v. Chapman,* 1921 OK 367, 202 P. 303; *Herrington v. Hackler,* 1937 OK 720, 74 P.2d 388; *E.S. Miller Labs. v. Griffin,* 1948 OK 149, 194 P.2d 877. Public policy justifies that result because in contrast to business contracts in other areas, these contracts have passed initial judicial scrutiny. That is, they may not be enforced unless the bargained for conduct has been found reasonable and in furtherance of the public interest. *Bayly,* 1989 OK 122 at ¶ 12, 780 P.2d at 1172 ("Section 217 prohibits only unreasonable restraints on the exercise of a lawful profession, trade or business.").[17]

¶ 45 We find that Inergy has made a sufficient showing that there is a reasonable probability that it will suffer irreparable harm absent the injunction granted by the district court.

### CONCLUSION

¶ 46 This Court finds no abuse of discretion on the part of the district court in granting the temporary injunction. Accordingly, we affirm the district court's order.

¶ 47 **AFFIRMED.**

WISEMAN, J., concurs, and GOODMAN, P.J., concurs specially.

GOODMAN, P.J., specially concurring.

¶ 1 While I concur in the majority opinion, I write separately to emphasize an important point. Over the years, employers have drafted restrictive covenants seeking to protect various employment interests, including employer goodwill and trade secrets. A literal reading of § 219A(A) and (B) would eliminate all kinds of restrictive covenants, including reasonable agreements, leaving intact only those prohibiting a terminated employee from directly soliciting the sale of goods or services from the established customers of his former employer. Such a literal interpretation of § 219A could suggest abandonment of §§ 217, 218, and 219, Oklahoma's existing statutes governing restraint-of-trade agreements, and Oklahoma's existing case law interpreting these statutes.

¶ 2 I write separately to emphasize that §§ 217, 218, 219, and 219A must be read and interpreted together within the context of Oklahoma's existing case law applying to restraint of trade. Existing interpretive case law, and the present case, establishes that application of these statutes to restrictive covenants must always be tested by application of the rule of reason, as fully enunciated in the majority opinion.

¶ 3 Finally, one finds much loose language in restraint of trade cases. *Loewen Group Acquisition Corp. v. Matthews,* 2000 OK CIV APP 109, 12 P.3d 977, could be construed as just such an example. As a member of Division Four when it issued *Loewen,* my interpretation of that opinion has always been that it reinforces the application of the doctrine of the rule of reason to these restrictive covenants. Any invocation of the concept of "fairness" in *Loewen* should not be construed as an abandonment of the rule of reason or undue emphasis on the common-law rules of fairness. Indeed, based on subsequent restraint of trade cases, the rule of reason analysis appears to me to have replaced any fairness test.

---

17. Although this is not a trade secret case, granting injunctive relief to enforce a non-solicitation agreement finds support in 78 O.S.2001 § 54(a), which provides: "Any person damaged or likely to be damaged by a deceptive trade practice of another may maintain an action in any court of equitable jurisdiction to prevent, restrain or enjoin such deceptive trade practice. *Proof of actual monetary damages, loss of profits or intent shall not be required."* (Emphasis added.)